JOSEPHINE I. MILNE, Admx., vs PROV. TELEPHONE COMPANY.

MAY 10, 1909.

PRESENT: Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1)  *Contributory Negligence.  Electric Appliances.*

Intestate, assistant foreman of linemen, while hunting for a "live ground," went up a pole upon which was a cable-box, from which ran a cable attached to and extending down the pole. From the same box ran a ground-wire, which ran down the street side of the pole to the ground. Both wires were in plain sight. While working on the pole intestate received a shock of electricity and was killed. It appeared from the testimony that intestate probably came in contact with the ground-wire, resulting in the passage of the current through his body, while he was working on the high-voltage wire. There was no emergency, but abundant opportunity for a careful examination of the pole and its equipment:—

*Held,* that, under the rule in *Judge* v. *Narr. Elec. Lt. Co.*, 21 R. I. 128, and 23 R. I. 208, deceased was guilty of such contributory negligence as to bar recovery.

(2)  *Evidence.*

A witness can not be allowed to testify as to what some third person may have assumed.

(3)  *Negligence.  Evidence.*

In an action arising out of death of intestate, a "trouble hunter," looking for a "live ground," from electric shock, while working on a pole of defendant's, the question by plaintiff, "What, if any, notice did deceased have, to your knowledge, that this wire was there uninsulated, and that it was there grounded in the ground?" was properly ruled out, where it appeared from the evidence that deceased must either have short circuited or grounded himself, that this ground-wire was in plain sight, and that linemen were expected to examine for such dangers.

TRESPASS ON THE CASE for negligence.  Heard on exceptions of plaintiff, and overruled.

BLODGETT, J.  Robert Milne, the plaintiff's intestate, was, on the 29th of July, 1907, the date of the accident, in the employ of the Pawtucket Electric Company as the assistant foreman of a gang of linemen. This company was engaged in furnishing electricity for light and power. On the date mentioned, Milne, with other employees of the company, went to the corner of

Weeden and Conant streets, in Pawtucket, to hunt for some trouble on the system, called by linemen a "live ground." Upon arriving at the corner aforesaid, Milne and another employee, named Foss, went up a pole there. This pole, together with other poles on the same street, belonged to the Providence Telephone Company, the defendant. Both the electric company and the city of Pawtucket had been permitted to place wires upon these poles, but it does not appear that the defendant received any compensation from either of the parties mentioned. So far as appears, these wires were placed upon the poles of the defendant by its permission, and simply as a matter of convenience to the other company and the city of Pawtucket.

Upon the pole at the corner of Weeden and Conant streets the defendant had a cable-box, from which ran a cable. The cable was attached to and extended down the pole. From this same cable-box ran a ground wire which ran down the street side of the pole to the ground, and was held in place upon the pole by a series of small staples. Both the cable and the ground wire, before mentioned, were in plain sight of any one who might choose to look for or observe them, and both had been there for some years.

The pole near the top was provided with several cross-arms for the accommodation of the different wires, and the wires of the telephone company were above those of the electric company.

After Milne and Foss had reached a convenient position for that purpose, they cut the high voltage wire belonging to the Pawtucket Electric Company, and after some other employees farther down the line had made some necessary changes or adjustments, which occupied something like three-quarters of an hour, they were notified to again connect up and tape the wire. After the connection had been completed, Milne proceeded to tape the wire, that is, to wind with tape the ends which had previously been stripped of insulation in order to make the connection. While doing this taping, Milne received a shock of electricity which immediately resulted in his death.

The uncontradicted testimony is that Milne was burned upon the right thumb and the right foot, and that he must have therefore come in contact with the high-voltage wire, and some ground wire at the same time, which caused the current to pass through his body. The testimony also shows that he probably came in contact with the ground wire and thus brought about the passage of the current through his body while he was working upon the high-voltage wire. There is also undisputed testimony that Milne was a lineman of experience; that there were two things which every lineman must look out for and avoid, one being a short circuit and the other a ground, and that Milne probably grounded himself by getting his foot in contact with the ground wire, running down the side of the pole, while his hands were in contact with the high-voltage wire which he was engaged in taping.

The case came on for trial October 15, 1908, before Mr. Justice Stearns and a jury, and at the conclusion of the plaintiff's testimony the court, on motion, directed the jury to find a verdict for the defendant.

The plaintiff has now filed her bill of exceptions to the ruling or decision of the Superior Court, alleging errors in the admission and rejection of certain testimony, and in the direction of a verdict for the defendant.

(2)    The first exception taken by the plaintiff is to the refusal of the court to permit the plaintiff to ask the following question (p. 70): "Q. 205.    (BY MR. HOGAN)    Did your linemen assume that the Providence Telephone Company would keep its equipment on the poles you used in common in reasonably safe condition?    MR. VINCENT:    He cannot testify as to what somebody else assumed."

The exception must be overruled upon the ground urged by the counsel for the defendant. Further, it affirmatively appears by the testimony of the plaintiff's same witness Smith, who was at the time of the accident the general manager of the Pawtucket Electric Company, that it was the duty of its inspector to inspect the equipment of the Providence Telephone Company as well as the equipment of the Pawtucket Electric Company, as shown by his testimony on page 72 of the record,

as follows: "Q. 211.   (BY MR. HOGAN)   Was it a part of his duty to inspect the Providence Telephone Company equipment as well as your own equipment?   Ans.   I think it is; I think it was."

(3)    The second exception is to a refusal to permit an answer by the witness Foss, an employee of the Pawtucket Electric Company, who was working with Milne on the pole in question at the time of the accident, to the following question (p. 139): "Q. 380.   (BY MR. HOGAN)   What, if any, notice did Milne have, to your knowledge, that this wire was there uninsulated and that it was there grounded in the ground?"

It was said by this court in *Judge* v. *Narragansett Electric Lighting Company*, 21 R. I. p. 128: "As an experienced lineman and trouble hunter, he must have been aware of the dangerous nature of the work which he was called upon to perform, and must have known that if he permitted himself to come in contact with a grounded wire while handling or in contact with a heavily charged wire, like those of the defendant, or created a short circuit whereby the current from these wires was passed through his body, serious injury, if not death, was reasonably certain.   In these circumstances he was bound to the exercise of a very high, if not the highest, degree of care, or, in other words, to a degree of care commensurate with the dangers to which he was exposed.   The deep burn upon the hand, and the evidence furnished by the autopsy that he had received a severe electric shock, with the certainty that these could have resulted only from his becoming grounded while in contact with a heavily charged wire, or from his creating a short circuit for the current through his body, raise an inference that he was not exercising the high degree of care required in such a dangerous employment.   In the absence of evidence to rebut such an inference, and the burden of proof of due care being on the plaintiff, we do not think that the jury were warranted in finding that the deceased was not guilty of contributory negligence."

The testimony here affirmatively and by the plaintiff's witness shows that the deceased was a "trouble hunter," looking for a "live ground," and the record further shows as

follows, by the testimony of plaintiff's witness, Smith (p. 69):
"C. Q. 195.  (BY MR. VINCENT)  What sort of work was it,
Mr. Smith, that this man was doing as to its being dangerous?
A. He was looking up the ground on the system.  C. Q. 196.
Is that supposed to be a very dangerous part of the work?
A. It is.  C. Q. 197. Now, what is it necessary for this man
to look out for when he is looking up a ground in that manner?
Must he be careful that he does not ground himself?  A. He
must be careful that he don't get his body in circuit with
another ground.  C. Q. 198. That is to say, he must not
short circuit himself and he must not ground himself?  A. No,
he must not ground.  C. Q. 199. If he escapes those two
things he is reasonably safe?  A. Yes.  C. Q. 200. And it
would be necessary in order for this man to have got a shock
there for him to have done one or the other of those two things?
A. One or the other.  C. Q. 201. Well, now whether this
lineman did,—is there anything for them to do when they are
about to go up a pole like this?  Are they expected to make
any examination?  A. Why, yes; they are supposed to look
out for themselves.  C. Q. 202. They are supposed to find
out whether there is any chance of their short circuiting or
grounding?  A. Yes, that is what they are to look out for.
C. Q. 203.  And linemen understand it, don't they?  A. Oh,
yes;" and by the testimony of plaintiff's witness, Wilson, it
appears that this wire could be seen from the sidewalk (p. 82):
"C. Q. 74.  (BY MR. VINCENT)  Did I understand you, Mr.
Wilson, to say that this wire that has been spoken of, leading
down the side of the pole, which was secured by staples, was
that on the street side?  A. Yes, on the street side.  C. Q. 75.
It was on the outside of the pole, secured by staples?  A. Yes;
yes.  C. Q. 76. It was in plain sight if you looked for it, was
it not?  A. Oh, yes.  C. Q. 77.  And you could see it running
up the pole?  A. Yes, sir.  C. Q. 78.  And where were you
standing when you could see it running up from the foot of
the pole, on the sidewalk or on the street, down on the ground?
A. I was on the sidewalk when I saw it."  While it does not
clearly appear from the testimony that the deceased climbed
the pole on the side on which the wire ran, and hence that it

would have been but a few inches from his eyes while he was so climbing, it is nevertheless not disputed that this wire was on the street side of the pole, and that he apparently ascended the pole on that side. Thus the plaintiff's witness, Foss, testifies as follows (p. 108): "Q. 73. When you got to this pole what did you do?   A. I went up and cut the wires, cut them clear.   Q. 74. Which side of the pole did you go up on?   A. On the street side.   Q. 75. How did you get up?   A. We climbed up to the steps, and I used the steps the rest of the way up."   And this is confirmed by the testimony of the plaintiff's witness, Ether, who drove both Milne and Foss to the pole in question, and testifies that he sat in his wagon and watched the men at work, as follows (p. 37): "C. Q. 332. They were looking for trouble:   What was the trouble?   Do you know anything about that ?   A. They say it was a ground. C. Q. 333. There was a ground somewhere?   A. Yes.   C. Q. 334. When you go out with these men, or, rather, in the first place, where were you during the time that you have testified you saw those men on the pole?   A. Where was I?   C. Q. 335. Yes.   A. I was right in the back end of my wagon.   C. Q. 336. In the back end of the wagon?   A. Yes.   C. Q. 337. Sitting down or standing up?   A. I was sitting down.   C. Q. 338. Which way were you facing, towards the pole?   A. I was faced towards the pole.   C. Q. 339. You always make it a rule to sit there and watch them, the moment you see the men working?   A. No; that day I didn't have anything else to do but to watch them," and that he saw Milne go up the pole, as follows (p. 13): "Q. 101. What time was it when you got to Conant and Weeden streets with Mr. Milne and the rest of the wire gang that day?   A. It must have been about half past one before we got there, or a quarter to two.   Q. 102. Which of the two men went up first?   A. I could not say which one went on first.   I could not say that.   I don't know which one went on first.   Q. 103. Did you see Mr. Milne go up the pole?   A. Yes, sir.   Q. 104. From which side of the pole did he ascend?   He generally went up from the road side. Q. 105. What do you mean by that?   A. On the street side. Q. 106. What, if any, equipment was there on the pole to

enable the men to go up it?   A.  I didn't see anything only this wire.  That is all.  I didn't see anything.   Q. 107. Whether or not there was anything provided there for a man to step on when he went on?   A.  Yes; a little piece of wire that went down the pole.  There was a wire running down the pole," and this witness seems to have seen the wire even from his wagon.  And it has already been shown by the testimony of the plaintiff's witness Smith that linemen are expected to make an examination and ascertain "whether there is any chance of their short circuiting or grounding."  The exception is overruled.

The third exception is to the admission by the court of the following evidence by the plaintiff's witness, Foss, in cross-examination (p. 162):  "C. Q. 186.  Now, any wire that you are working on, a high-voltage wire, is dangerous to work in contact with any other wire, is it not?  Objected to.  MR. HOGAN: I don't know how this is in cross-examination of anything I have asked.  BY THE COURT: He has said it is dangerous for that man to come in contact with that wire on that pole.  MR. HOGAN: If it was a grounded wire.  BY THE COURT: It seems to me that is in cross-examination of that.  MR. HOGAN: Note my exception.  BY THE COURT: Exception noted.  Ans. Yes, sir."

This exception must be overruled.  The same witness had previously testified as follows in his direct examination:  "Q. 150.  Was a pole, like the pole in question, with a small wire running down to the ground in the position that this telephone wire was, a safe or a dangerous place for an electric-light man to do his work while he was working on the electric-light company's heavy current wire?  Objected to; objection overruled; exception noted in behalf of the defendant.  A.  Yes, sir.  BY THE COURT: What was it?  Q. 151.  (BY MR. HOGAN). Safe or dangerous?  A.  It was dangerous."

The remaining exceptions are to the direction by the court of a verdict for the defendant.

It clearly appears from the record, portions of which have been above set forth in considering the foregoing exceptions, that the unfortunate victim of this lamentable occurrence was

guilty of such contributory negligence in the premises as to preclude a recovery, under the rule heretofore laid down in *Judge v. Narragansett Electric Lighting Co.*, 21 R. I. 128, and 23 R. I. 208. It is undisputed that he was for three-quarters of an hour at least upon the pole, unoccupied and waiting for other workmen to do their work elsewhere. There was no emergency requiring a sudden ascent or descent of the pole, and immediate action to prevent damage to life or property, but abundant opportunity for a careful examination of the pole and all its equipment, had he seen fit to make such an examination; and the accident happened in the early afternoon of a July day, when there was abundant light for such a purpose.

The plaintiff's exceptions are overruled, and the case is remitted to the Superior Court with direction to enter judgment for the defendant.

*John W. Hogan*, for plaintiff.

*Vincent, Boss & Barnefield, and Alexander L. Churchill*, for defendant.