Jowett, Appellant, *v.* Pennsylvania Power Company.

Argued October 7, 1955. Before STERN, C. J., STEARNE, JONES, MUSMANNO and ARNOLD, JJ.

*Marvin D. Power,* with him *Vito Adamo, John W. McWilliams,* and *Margiotti & Casey,* for appellants.

*C. E. Brockway,* with him *Brockway, Brockway & Acker,* for appellee.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, November 30, 1955:

Our State Reports contain an extraordinarily large number of decisions of cases dealing with deaths and severe injuries to persons accidentally touching high tension wires, but while they enunciate general legal principles governing the subject each depends largely upon its own particular facts. The present is apparently the first case in which the happening of a tragic accident of that nature was caused by a television antenna—which its owners were engaged in repairing—breaking and coming into contact with the lines of a public utility company.

Marjorie Jowett, Administratrix of the estate of her deceased husband, Lee A. Jowett, and Jonathan Jowett, the father of Lee A. Jowett, are the plaintiffs in this action. Lee was killed and Jonathan burned by a bolt of electricity from the wires of the defendant, the Pennsylvania Power Company. The Jowetts lived in a house on the east side of Mill Street, in Clarksville, Mercer County, extending 36 feet along the street and of a depth of 18 feet; the distance from the ground to the peak of the roof was approximately 22 feet. Along the street was a line of poles on which were strung four wires belonging to the defendant company and two to

the Bell Telephone Company. Of the defendant's wires the top ones, which were primary or distribution wires, carried a charge of 7200 volts; the lower ones were service lines supplying the street lighting in Clarksville and carried only about 115 volts. Defendant's wires were installed in 1938 under permission of an ordinance of the municipality; they were at a height of about 39 feet above the ground and 22 feet above the peak of the roof of the house.

At some time during the Christmas week of 1951 the Jowetts installed an aerial on the south side of their house. It consisted of two pieces of ordinary galvanized pipe one and a quarter to one and a half inches in diameter; one of the pieces was 21 feet long and the other 26 feet 6 inches, and they were connected by a threaded coupling one and three quarters inches in length. The overall length of the pipe being 47 feet 6 inches it therefore projected some 25 feet above the roof; the coupling was a foot below the ridge of the roof. The pipe was placed on a piece of slag in a hole about a foot and a half below the surface; it was fastened against the side of the house by two metal clamps or "U" bolts, one midway between the ground and the roof, the other at or immediately below the roof. Near the top were the cross-pieces or prongs of the antenna which made up the receiving apparatus and each of which extended out 4 feet 7 inches. The entire aerial was secured in its erect position by the two clamps and by four guy wires, one to each corner of the roof; these were fastened to the aerial about 3 feet below the bottom of the antenna or some 8 feet below the top of the mast.

On January 18, 1952, as the result of a severe windstorm the southeast guy wire was torn loose from the aerial, and two days later the two Jowett men set out to repair it. Since the prospective reattachment of the

guy wire to the antenna would have been at a considerable height above the roof the Jowetts planned to lower the antenna so that it could be the more easily reached; to this end they planned to lift the pipe from out of the ground and move the bottom of it away from the wall until the top would be brought down sufficiently for their purpose. They loosened the lower of the two clamps but neglected to remove the upper one. They extended the size of the hole in order to facilitate the raising of the pipe and were in the act of lifting it and drawing the butt away from the wall when it broke at the coupling immediately below the roof. It appeared later that the two lengths of pipe had been coupled together in an extremely defective fashion in that, while one of them extended into the coupling an inch and a quarter, the other had been screwed in only about a quarter of an inch. Who had coupled the two pieces together in the first instance or to what extent, if any, the Jowetts had knowledge of the defect does not appear in the testimony.

The result of the breaking of the pipe was that the upper portion fell on the roof in such manner that either the tip of one of the prongs of the antenna came into direct contact with one of defendant's high tension lines, or so close to it as to permit the formation of an arc, and the Jowetts, holding the lower section of the pipe, were immediately shocked, Lee Jowett being electrocuted and Jonathan Jowett severely burned; the ground on which they were standing was wet and a drizzling rain was falling. It appeared that Jonathan Jowett, the father, 52 years of age, had been engaged for 25 years in the business of installing neon signs and therefore accustomed to working with electricity, while Lee Jowett, 31 years of age, had also been 7 years in the neon sign business. Jonathan Jowett, the survivor, testified that he did not know that the two top

lines which ran in front of the house were high voltage lines.

At the conclusion of plaintiffs' testimony the court granted defendant's motion for a compulsory nonsuit which it subsequently refused to take off, and from such refusal plaintiffs now appeal.

There is, of course, no question but that defendant had a perfect right to maintain and operate its lines in the position which they occupied, and, on the other hand, the Jowetts had also a perfect right to erect and maintain their antenna on the side and above the top of their house where they had placed it. Plaintiffs do not claim that the wires were in undue proximity to the house or that they should have been insulated; (it was testified that such insulation would have been impracticable). The only ground on which they assert a liability of defendant was its failure to warn them that two of its wires were carrying so high a voltage that contact therewith would have been extremely dangerous if not fatal. It was brought out in the testimony that defendant had written a number of letters to various property owners having antennae above their roofs warning them of the proximity of the high tension wires and of the possible danger of the antennae breaking or being blown over by a storm into contact with defendant's lines, and plaintiffs contend that defendant should have given similar notice to them after it knew or should have known of the location of their antenna. In that connection they attempted to show that one of defendant's meter readers, who incidentally was charged with the duty of reporting any construction that might be considered a hazard, actually or presumably saw plaintiffs' antenna a couple of weeks before the accident happened. Defendant denies this, but even if we were to assume that it did know, or should have known, of the existence of the aerial, was there any

duty upon it to give the warning claimed by plaintiffs? Being at a distance of some 22 feet from defendant's lines, the antenna was apparently well out of harm's way under all normal and likely conditions. What defendant might have been bound to take into consideration was the possibility that the antenna might, through some natural cause or agency, come into contact with their wires, but it was certainly not obliged to anticipate that *human* intervention, aided by the existence of a careless defective coupling, would bring about an accident such as that which happened.

All liability for negligence rests upon a reasonable duty to foresee the likelihood of the happening of an injury apt to result from one's act; there is no such duty to apprehend that an intervener will, either wilfully or carelessly, bring about a result which would not have been occasioned by natural forces or ordinary events. Thus in *Geroski v. Allegheny County Light Co.*, 247 Pa. 304, 93 A. 338, it was held that an electric company maintaining heavily charged wires 29 feet from the ground and 12 feet from a building could not reasonably be held to anticipate that the janitor of the building in attempting to hoist a flag on a pole by means of a copper wire would manipulate the wire from his position on the ground in such manner as to bring it in close proximity to the electric wires, thereby resulting in a shock causing his death. There are several cases cited in the opinion in that case of somewhat similar nature in which a defendant electric company was likewise exculpated from liability. In *Mirnek v. West Penn Power Co.*, 279 Pa. 188, 123 A. 769, it was held that the defendant was not required to foresee that that which had been safe would become harmful by reason of the action of a third party, and that, in the erection and maintenance of its poles, wires, and other appliances, it was bound to anticipate only such com-

binations of circumstances, and accidents and injuries therefrom, as it might reasonably forecast as likely to happen. Thus, in *Trout v. Philadelphia Electric Co.*, 236 Pa. 506, 84 A. 967, where a boy, endeavoring to detach a kite from an electric wire strung some 4 feet from the cornice of his house, threw a string over the wire in order to pull it towards him and received a shock which resulted in his death, the court said (p. 509, A. p. 968) : "The act of the boy in getting hold of the wire was wholly unrelated to any act of the defendant in connection therewith. Had the wire been so close to the house that the boy might naturally have come in contact with it while playing about the roof, it might be contended that its condition was the proximate cause of his death. But such was not the case; . . . The boy could have run and played all over the roof without the possibility of his coming in contact with these wires. It was an original independent act of the deceased which could not reasonably have been anticipated that brought about this most sad accident, and the act was not induced by or did not follow as a natural sequence to any negligence of the defendant in connection with its wires. Under such circumstances there could be no recovery, and the defendant was entitled to binding instructions as requested."

There are many cases in the books fixing liability upon a power company where its wires were in such close proximity to a place where persons would ordinarily be engaged in carrying on their work that they were likely to come into contact therewith. The present, however, is not such a case. Indeed, concerning defendant's duty of warning the Jowetts, it is clear that even if such a warning had been given the result would have been the same, because Jonathan Jowett frankly admitted that while, if he had known of the danger of contacting the more highly charged wires he would, in

preparing to take the antenna down, have put a hand line on it and tied it to the east side of the house so as to pull the antenna away from the wires, he would have done the same thing if he knew the wires carried a charge of only 500 or even 115 volts; obviously the reason he failed to take any such precaution was because he either was unaware of the defect in the coupling or, knowing of it, carelessly ignored the danger it created. Even if, therefore, there had been any duty on the part of defendant to warn the Jowetts under the circumstances of this case, the failure to give such a warning was not the cause of the accident that occurred. It is true that while the ordinary person is held to know that it is dangerous to come in contact with, or in close proximity to, electric wires and it is his duty to avoid them so far as he may, *Haertel v. Pennsylvania Light and Power Co.*, 219 Pa. 640, 643, 69 A. 282; *Aljoe v. Penn Central Light & Power Co.*, 281 Pa. 368, 371, 126 A. 759, 760, he would not be bound to know the extent of that danger in any particular case whereas the company owning and operating such a dangerous agent would be obliged to have such knowledge and to observe care accordingly: *Fitzgerald v. Edison Electric Illuminating Co.*, 200 Pa. 540, 543, 50 A. 161; *Brillhart v. Edison Light and Power Co.*, 368 Pa. 307, 313, 314, 82 A. 2d 44, 48. But there was necessarily *some* degree of danger to be recognized by the Jowetts and averted by them as far as possible when they undertook to repair their aerial, and nevertheless they did not act with wise judgment and all possible care in the manner in which they sought to lower the antenna to the roof of the house. In view of the fact, however, that it was not proved that it was they who had coupled the two portions of the pipe when the aerial was originally erected, or that they knew of its condition, it cannot, perhaps, be said that the way in which they at-

tempted to repair the antenna was so obviously careless and ill advised that they should be held guilty of contributory negligence as a matter of law.* What is entirely clear is that the actual and proximate cause of the accident was the defective condition of the coupling, which, without proved negligence on the part of either party, broke under handling by the Jowetts and thereby brought about this wholly unanticipated and fortuitous fatal occurrence.

It is true that ordinarily the question of proximate cause is for the jury, but it becomes one of law when, as here, the undisputed facts make it clear that the negligence alleged did not cause the injury: *Frisch v. Texas Company,* 363 Pa. 619, 622, 70 A. 2d 290, 292, and cases there cited; see also *Elliott v. Allegheny County Light Co.,* 204 Pa. 568, 54 A. 278; *Helmick v. South Union Township,* 323 Pa. 433, 439, 185 A. 609, 611, 612.

---

* The court below did hold that the Jowetts were guilty of contributory negligence, saying that "Four men had erected the aerial and during the process they had been careful to secure the aerial by guys and hand lines so that it could not fall. Nevertheless when the two came to repair it, knowing that the guy wire at the southeast corner was loose and that possibly it might fall toward the power lines, they proceeded to lift, one on each side of the pipe. Because three of the wires remained fastened, tension and a drawing of the aerial toward the power lines was bound to ensue as the resultant of forces. The two men did more than lift. They drew the butt of the pipe out from the wall. There was no point in raising the pipe unless they also drew it out from the wall so that the tip would be lowered to a point where it would be within reach of the roof so as to permit reattachment of the guy wires. This induced two new kinds of strain. First the weight of the antenna on the end of the long pipe and the pipe itself would tend to break the pipe as it reached a position near the horizontal; Second, the U bolt at the peak of the roof was not removed or, as far as is disclosed by the evidence, even loosened. To pull the butt of the pipe out and up would require that the clamp bend or break and would add to the strain caused by the weight of the antenna. The pipe actually broke about a foot below the clamp."

The order refusing to remove the compulsory nonsuit is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On Christmas Eve of 1951, Jonathan Jowett gave to his son, Lee A. Jowett, and his family, what is perhaps one of the most attractive gifts that can today be bestowed upon one in moderate circumstances—a television set. Between Christmas Day and New Year's Day, Jonathan and his son, together with two or three other persons, erected an aerial for the accommodation of the television, this aerial consisting of a pipe some 48 feet high, planted in the ground and rising to a height of 25 feet above the roof of the house where it was surmounted by appropriate antennae.

On January 18, 1952, a severe storm tore one of the supporting guy wires loose, a lead-in wire broke, and, as a consequence, the magic of wireless drama, music and song ceased in the home of the Jowetts. The members of the household immediately complained and on the following Sunday, January 20th, Jonathan Jowett arrived, assuring them that he and his son Lee would repair the magic apparatus in time so that, as the grandfather described it, "the kids could see this 5 o'clock kid show. Something comes on at 5:00 kids like." The repair job was a simple one: it meant lowering the antennae to the roof of the house so that a new guy wire could be attached and anchored, the lead-in wire re-connected, and the aerial re-hoisted. In order to accomplish this operation, Jonathan and Lee lifted the base of the aerial pipe out of the ground, intending to move it horizontally a sufficient distance so as to lower the crest of the aerial within reaching distance on the roof. While engaged in this maneuver, a bolt of electricity fell like a flash of lightning and struck them

both, killing Lee outrightly and inflicting severe injuries to Jonathan.

It appears that the moving of the aerial subjected the coupling between the two pieces of pipe, which composed the aerial, to a strain which caused it to part at this point, and one of the prongs of the antennae fell against a high tension wire of the defendant power company thus transmitting its high voltage to the aerial, the base of which was in the hands of the two men on the ground.

Jonathan Jowett and Marjorie Jowett, administratrix of the estate of Lee. A. Jowett, brought suit against the Pennsylvania Power Company, charging it with negligence in the erection and maintenance of the transmission line. There was nothing about the company's wires to acquaint the average person with the knowledge that they carried death-dealing electricity to the tune of 7200 volts. The wires were strung on innocent-looking telephone poles which carried also the usual harmless telephone lines. The lower Court entered a nonsuit against the plaintiffs and the majority of this Court has affirmed the nonsuit. I cannot agree.

This Court has said repeatedly that: "In a negligence case a nonsuit can be entered only when it is inconceivable on any reasonable hypothesis that a mind desiring solely to reach a just and proper conclusion in accordance with the relevant governing principles of law, after viewing the evidence in the light most advantageous to the plaintiff, could determine in his favor the controlling issues involved." *

Like a phonograph record that has been played so often that no listener follows the melody and much less the meaning of the words (if any), the rigid standard

---

* *Virgilio v. Walker,* 254 Pa. 241; *Ehrlich v. U. S. Fid. & Guar. Co.,* 356 Pa. 426; *Stewart v. Loughman,* 367 Pa. 492.

of nonsuits laid down by this Court in the cases cited is, according to my observation, rarely followed. Certainly it was not followed in the case at bar, for I cannot assent that it is inconceivable that on any reasonable and legal hypothesis it was impossible for culpable negligence to have been present here. The granting of a nonsuit is one of the most drastic procedures accomplished in a courthouse, and, in my opinion, it should not be invoked unless the plaintiff's case is so obviously opposed to reason, natural law, and the immutable sequence of cause and effect that it would be folly to consume time deliberating on it. A nonsuit shuts off one-half of the case which, even though coming from the opposing side, might still supply illuminating facts which would assure the ideals of Justice that no one's cause is being dismissed amid the shadows of indecision and the dusk of troubling doubt.

This case deals with a comparatively new phase of science. Law must never lag behind science but keep pace with it, and there is no reason why progress in technology should be made at the expense of human rights. Technology and civic prerogatives may travel together so that whatever hazards follow in the wake of science, as it moves forward in its conquest of the mysterious forces of the universe, may be met and overcome in behalf of the human race for which the progress is being made. Otherwise progress is a misnomer and mankind is bound for destruction.

I believe we can say without fear of contradiction that television is here to stay, and I believe that the law will adjust itself to all the new problems which this new industry may create in the field of jurisprudence. I fear, however, that the Majority Opinion fails to analyze the case before us in the laboratory of objectivity but disposes of it entirely as a matter of dialectics. In studying this television case we might

first contemplate what happened first and then proceed to what happened last. The Majority Opinion I believe operates in the wrong channel of reasoning when it says: "What is entirely clear is that the actual and proximate cause of the accident was the defective condition of the coupling, which, without proved negligence on the part of either party, broke under handling by the Jowetts and thereby brought about this wholly unanticipated and fortuitous fatal occurrence."

The actual and proximate cause of the accident was not the defective coupling but the failure of the defendant company to notify the Jowetts of the mortal danger lurking in their transmission wires. In *Mars v. Meadville Telephone Co.*, 344 Pa. 29, 31, this Court said: "The rule is thus stated in Cooley on Torts (1st ed., p. 70; 4th ed. 850): 'If the original act was wrongful, and would naturally, according to the ordinary course of events, prove injurious to some other person or persons, and does actually result in injury through the intervention of other causes which are not wrongful, the injury shall be referred to the wrongful cause, passing by those which were innocent.' "

In *Murray v. Frick*, 277 Pa. 190, 194, we said: "One who negligently creates a dangerous condition cannot escape liability for the natural and probable consequences thereof, although the innocent act of a third party may have contributed to the final result."

Television has become as much a part of the standard American home as central heating, screen doors, and a dog. No one can install close to a home any electrical device peculiarly dangerous to TV antennae and plead lack of knowledge of the perilous affinity between the device and the TV apparatus. The Majority says: "What defendant might have been bound to take into consideration was the possibility that the antenna might, through some natural cause or agency, come

into contact with their wires, but it was certainly not obliged to anticipate that *human* intervention, aided by the existence of a careless defective coupling, would bring about an accident such as that which happened." (Emphasis in Majority Opinion.)

The human intervention here was secondary. It was not the defective coupling which ignited the fuse of lightning which destroyed Lee Jowett and seared his father with horrible burns. It was the storm.

The Majority says that the defendant company might have been liable if the antennae had come into contact with its transmission lines "through some natural cause or agency." Storms in the Temperate Zone are as natural a phenomenon as sunshine itself. The person or company that does not anticipate the agitation of the elements and make provision against its violent results is improvident indeed and cannot escape responsibility when those elements use his equipment to strike down the innocent and the unwary.

The telephone company well knew that the proximity of television antennae to its transmission wires was the nearness of flame to combustible substance. So aware was the company of this highly perilous circumstance that it wrote letters to some owners of aerials as follows: "The aerial which you have erected is in a location where it might fall into the lines near your premises. We are writing to call this to your attention so that you may take whatever steps are necessary to protect your premises from any hazard."

But the company wrote no letter to the Jowetts.

The Majority suggests that because Jonathan Jowett and his son had been engaged in the business of installing neon signs that, in some manner without explaining how, they could have averted the accident. There was nothing to put them on notice that the lines on the telephone poles were high voltage lines. The

wires were strung 39 feet above the ground and gave every indication of being as innocuous as the sparrows which twittered about its silvery strands. A Mr. Kennedy who occupied one-half of the house inhabited by the Lee Jowetts testified that he thought the tension wires were telephone wires. Wayne Thomas, who often visited at the Jowett's home was of the impression the high tension wires were the same as the service wires which entered the house. Rev. Johnson, minister of a church close to the Jowetts home, assumed that the high tension wires were no different from the docile wires which supplied the power for his own house.

Although people living in the immediate vicinity of the Jowetts were lulled into a false security regarding the nature of the defendant's power lines, the defendant was thoroughly aware of the devil's fire which coursed through the slender conduits; and it was its duty to inform everyone, not only a chosen few who received letters, of the kiss of death that could be expected from the harmless looking "telephone wires." Numa F. Vidal, division manager of the Pennsylvania Power Company, testified directly about the hazards of television aerials close to high tension wires: "Q. Is such an aerial remaining upright so long as it remains upright, is it a hazard? A. Yes. Q. Why? A. Because in falling, it might hit the wire."

The Majority properly says that: "All liability for negligence rests upon a reasonable duty to foresee the likelihood of the happening of an injury apt to result from one's act."

Who is to decide the applicability of that reasonable duty? As I read the cases, it is the jury. In *Brillhart v. Edison Light and Power Co.*, 368 Pa. 307, this Court said: "The evidence in the case was amply sufficient to *carry it to the jury* on the question of the defendant's causative negligence. A supplier of electric current is

'bound not only to know the extent of danger, but to use the very highest degree of care practicable to avoid injury to everyone who may be lawfully in proximity to its wires and liable to come accidentally or otherwise in contact with them' (cases cited.) 'When human life is at stake, the rule of due care and diligence requires everything that gives reasonable promise of its preservation to be done, regardless of difficulties or expense.' " *

"Although a minimum clearance for high voltage wires strung over buildings and land has not been statutorily prescribed, the common usage in the business is a fair test or standard of care. (citing cases.) As stated in Loelsch v. The Philadelphia Company, 152 Pa. 355, 362, 25 A. 522—'While no absolute standards of duty in dealing with such agencies can be prescribed, it is safe to say in general terms that *every reasonable precaution suggested by experience and the known dangers of the subject ought to be taken.*"

In pointing out that the defendant's high tension wires in that case were too close to the property of the injured party, we said: "Having failed to observe any active precautions, which experience reasonably should have suggested, the defendant could at least have taken the passive precaution of warning others of the dangerous wires by posting notices of their proximate presence."

But the defendant company here posted no notices, it distributed no warnings to those who lived on the street the Jowett home bordered. Not only was the company passively negligent in this respect; it was actively negligent. One of its meter readers, Gladding Wiburt, testified that he was instructed by his employer to report the hazard of television antennae located

---

* Italics mine.

close to high tension lines. On January 18, 1952, only 12 days before the tragedy, he inspected the meter at the house occupied by Lee Jowett and family but failed to note the presence of the antennae. I submit that this failure on his part to note what was so obvious was a negligent act chargeable to the defendant company under the rule of respondent superior. Although Wiburt testified that he did not see the antennae, his meter book carried a notation on the back of the page dedicated to the house in which the Jowetts lived, namely, "TV Aerial." This item of evidence was something to be presented to the jury for evaluation in connection with the question of the charge of negligence.

The Majority mentions the meter reader's testimony only to dismiss it with the rhetorical question: "Even if we were to assume that it [the corporation] did know, or should have known, of the existence of the aerial, was there any duty upon it to give the warning claimed by plaintiffs?" I would answer that question with another question: "Why shouldn't it give warning?" If a railroad engineer is required to blow a whistle as his train approaches a crossing, certainly the conveyor of a train of 7200 life-extinguishing volts should be required in law to give warning to those who are in the immediate vicinity of its fulminating trajectory.

The defendant company argues that if the plaintiffs were allowed to recover here, the company would then have to continue elevating the heights of its poles above television aerials, to patrol its territory to watch for new television aerials, and place its poles in the highway at remote distances from built-up areas. These hypotheses are entirely irrelevant. A litigant may not ask for an adjudication in his favor by conjuring an exaggerated state of affairs and expect a decision on a purposeful hyperbole. We have a specific situation here

which, as I view all the facts, reveals, prima faciedly at least, indifference on the part of the defendant company to the safety of people lawfully about their affairs. In *Brillhart v. Edison Light and Power Co.*, supra, we said: "When human life is at stake, the rule of due care and diligence requires everything that gives reasonable promise of its preservation to be done, regardless of difficulties or expense."

But the company here could have disobligated itself of its obvious responsibility without any undue expenditure. It would have been a very simple matter to notify all the company customers to keep their television antennae safely distant from transmission lines. A cheaply printed handbill could have been circulated by the meter readers to the power corporation's clients, including the Jowetts. The defendant's failure to take the precautionary measures which the circumstances so obviously dictated, raised, as I view it, a question of fact for the jury as to whether the company had met its responsibility of due care toward those who had the right to expect that due care.

The Majority makes the rather strange assertion that even if the Jowetts had received warning of the danger in the transmission lines the accident would still have occurred, and in support of this anomalous conclusion the Majority argues as follows: "Indeed, concerning defendant's duty of warning the Jowetts, it is clear that even if such a warning had been given the result would have been the same because Jonathan Jowett frankly admitted that while, if he had known of the danger of contracting the more highly charged wires he would, in preparing to take the antenna down, have put a hand line on it and tied it to the east side of the house so as to pull the antenna away from the wires, he would have done the same thing if he knew the wires carried a charge of only 500 or even

115 volts; obviously the reason he failed to take any such precaution was because he either was unaware of the defect in the coupling or, knowing of it, carelessly ignored the danger it created. Even if, therefore, there had been any duty on the part of defendant to warn the Jowetts under the circumstances of this case, the failure to give such a warning was not the cause of the accident that occurred."

This exposition is not only involved and perhaps confusing, but whatever may have been its intended meaning, it is not supported by the record. This is what Jonathan Jowett said: "Q. Now, Mr. Jowett, I ask you to assume that you know that within 22 feet of this television antenna as erected and as the situation was when you started to work on it with your son, had you known of this danger, how would you have gone about taking this antenna down? A. I would have put a hand line on it, a small rope and tie that other end of the small rope to the east side pulling over toward the east side of the house. Q. And the purpose of that? A. *That would never have left the television antenna go over into the wires."*

I do not see how from this testimony the Majority draws the bizarre conclusion that had Jonathan known of the high voltage in the overhead wires the result would have been the same. Had the Jowetts known that the cross-arms of the inoffensive-looking telephone pole was a potential gibbet ready to ensnare them in its lethal grasp, they would indeed have given it a wide berth. Life is sweet and it cannot be lightly assumed that Lee and Jonathan Jowett would have, with insensibility and recklessness, permanently darkened, for their children and grandchildren, the television screen of their continued existence.

I dissent.