Grant COLEMAN, Respondent,

v.

NORTH KANSAS CITY ELECTRIC
COMPANY, a corporation,
Appellant.

No. 44673.

Supreme Court of Missouri,
Division No. 2.

Jan. 14, 1957.

Motion for Rehearing or to Transfer to
Court en Banc Denied Feb. 11, 1957.

David R. Hardy, Lane D. Bauer, Sam B. Sebree, John S. Marley, Sebree, Shook, Hardy & Ottman, Kansas City, Alan Wherritt, Wherritt & Turpin, Liberty, John J. Alder, Kansas City, for appellant.

John W. Mitchell, Mitchell & Meise, Kansas City, James Simrall, Jr., Simrall & Simrall, Liberty, Paul C. Sprinkle, Sprinkle, Knowles & Carter, Kansas City, of counsel, for respondent.

LEEDY, Judge.

Action for damages for personal injuries arising out of a casualty which occurred while the plaintiff, Grant Coleman, was in the employ of defendant corporation, North Kansas City Electric Company, which injuries were allegedly sustained as the result of the negligence of the employer. Coleman had rejected the Workmen's Compensation Act, Chapter 287, RSMo and V.A.M.S. Upon a trial in the Clay Circuit Court of this, his common law action, verdict and judgment went in his favor in the sum of $65,000, and defendant-employer appealed.

Plaintiff is an electrician, and at the time he was injured was 35 years of age. Defendant is a corporation engaged in the business of electrical repair and installation work. It is owned in large part and operated by members of plaintiff's wife's family, her father and brother having been in the active management of the company at the time of the accident. One of its principal customers or retainers is the Staley Milling Company, a large concern located in North Kansas City. Plaintiff was injured while doing electrical work in and upon a substation at one of the Staley mills. He submitted his case under instructions which

hypothesized negligence on the part of defendant in failing to warn him of the danger of the electricity, and in failing to cut off the electricity, or have the same cut off while plaintiff was working. Defendant contends that the evidence fails to show any actionable negligence on its part, but, if it does, then under the evidence plaintiff was guilty of contributory negligence as a matter of law, and further that he assumed the risk of injury from the electricity as a matter of law, as alleged in its answer.

The outdoor substation in which plaintiff was working at the time in question is a fenced enclosure approximately 25x30 feet with the long way north and south. Within this enclosure is a tall superstructure or steel frame (exact dimensions not shown) which supports the 13,200 volt primary lines or conductors overhead and appurtenances connected with such an installation. Beneath the steel frame were two concrete platforms (both running east and west), and on one of these were three hooked-up or alive and functioning transformers (hereinafter referred to as the old transformers); on the other platform were three new transformers which had not yet been energized or connected. The old transformers were about 8 feet from the north end of the enclosure, and the platform on which they rested was 15–18 inches above the level of the ground. The east transformer on this platform was 4–5 feet from the east fence, and the west transformer was 1½–2 feet from the fence on the west. The height of these old transformers, including platform, was 6–7 feet. They were hooked up on both their primary and secondary sides, the primary or high voltage line in each instance being connected to the south side, and the secondaries connected on the north side of the old transformers.

The new transformers, resting on the second concrete platform, were 3½–4 feet south of, and parallel to, the bank of the three old transformers above mentioned.

Their height was 6½–7 feet from the floor of the platform, which was itself 4–6 inches above ground level. The diameter of the new transformers was 2–2½ feet at the top, and they were 12–15 inches higher than the old ones, and about 6 inches greater in diameter. Each of the old transformers had a primary line of 13,200 volts coming into it. A primary line was connected to the east old transformer on its south side, the line going out of the top of the transformer, and ran somewhat to the south under the south edge of a catwalk on top of the old transformers at about a 45 degree angle, then fastened to a knife switch which was mounted on a cross member at a 45 degree angle, and from the knife switch, which was on an insulator, fed straight up to the top of the station, or straight toward the top of the station. The knife switch was about 4 feet above the level of the new transformers, at their north edge, and somewhere near the middle of the distance between the east and middle transformers. The primary line ran almost straight up, as stated. It was about 1–1½ feet north of the north edge of the new east transformer, and approximately on a line with the west edge of said transformer.

Before going to the job on which he was injured, plaintiff and another electrician, John Lingo, had been working together on an electrical construction job for defendant at the Jones and Laughlin plant in Kansas City, Kansas, which had shut down because of a strike by some other craft. On the day before the accident they had reported back to defendant's shop for assignment to other work, and were directed to go to the Staley mill, where they reported to Jake Flanary, an employee and general foreman of defendant who was in charge of all electrical work at the two Staley mills. Flanary was also the steward for the Local Union to which plaintiff belonged, and he and plaintiff carried precisely the same Union classification card. They arrived at the plant about 10 o'clock A.M., and Flanary got the key to the substation, took the two workmen inside and outlined

to them the work to be done. Flanary remained about 10 or 15 minutes. Among other work thus directed was that of making up and installing copper bus bars on the secondary side of the new transformers and connecting them to each other, but not with the current, and also the stringing of a delta bar or cable between the two sides of the substation. He did not tell them what to use or how to use it, but left it strictly up to them to select and procure the equipment needed. The necessary materials were not at the substation but were at the shop of the nearby No. 2 Staley mill, to which place Lingo and plaintiff went and obtained the materials, as well as two ladders. They worked in and about the substation (in making up and installing the copper bus bars for the new transformers) during the remainder of the first day and until the afternoon of the next, without incident.

At the time of the casualty plaintiff and Lingo were engaged in installing the delta bar or cable which was to be attached to the frame of the substation at the east and west sides thereof, 12 or 14 feet above the surface of the ground, and 7–7½ feet south of the nearest primary line. Holes were bored in the steel frame on both the east and west sides, the cable cut and insulators put on both ends. Fastening was to be accomplished by means of putting eye bolts through the holes with nut fasteners on the other side. They fastened the cable to the east part of the frame first, and then the west, when it was discovered that the eye bolts did not have sufficient threads to permit the slack in the cable to be taken out by tightening the bolts. Flanary had directed that the delta bar or cable be tight and neat looking. The two workmen then decided to remove the slack by the use of a block and tackle, which they obtained at the shop at the No. 2 mill. Returning to the substation with the block and tackle, they fastened one end to one side of the steel framework and the other to the free end of the delta bar. In an effort to tighten the delta bar they pulled on the rope in the block and tackle from the ground, standing in the open area south of the new transformers under the delta bar or cable and somewhat to the east of the west insulator on the delta bar. From this position the rope was not long enough to permit pulling from a point on the ground much farther to the east. The pull they made proved to be too much downward, and so they were unsuccessful in tightening the cable from this position. Plaintiff then went to the east side of the substation, as he said, "in order to get a straight pull directly back on the cable," got up on a ladder and stepped off of it onto the east new transformer, having first looked up from the ground and knowing that by getting up on the transformer he would be 3–4 feet away from the 13,200 volt primary line, he nevertheless felt "reasonably certain" that he had room to stand on the transformer. Plaintiff testified that he walked up the ladder and "stepped off to the transformer, turned, set myself about where I figured that I would need to be to make the pull, turned and stooped and reached to John [Lingo], who had stepped up a step or two on the ladder to hand me the rope, I reached down to get that rope. From there on I couldn't tell you." Plaintiff remembered nothing of what happened thereafter until waking up in the hospital. He testified on cross-examination that he did not attempt to pull on the block and tackle from the ladder, and never gave a thought to securing an additional piece of rope so that he could pull it from the ground; that after he left the ground he never looked to see how close he actually was to the nearest high voltage line, and never looked at the high voltage line after getting on the transformer; after he climbed onto the transformer he faced to the southwest, and then turned and stooped to get the rope from Lingo, who was standing on the ladder; he twisted around to his left, took the rope from Lingo in his right hand, and started to turn back and straighten up, but did not remember reaching a full standing position. His last mem-

ory was that of taking the rope from Lingo and starting to straighten up.

Lingo testified that after he had given plaintiff the rope from about the third step on the ladder, he climbed back down the ladder, turned around and had walked about 10 or 15 feet, or halfway across the substation when "the thing exploded—just a kind of loud pop is what it was," and plaintiff fell on the concrete pier with his head facing the east, partly wrapped around the transformer. Lingo then moved the ladder, picked up plaintiff, and after dragging him out about 6 feet started using artificial respiration. The witness had no knowledge of what plaintiff did, or what movements he made while on the transformer after he had handed him the rope and before he heard the explosion or pop. The last time he saw plaintiff it was his judgment that plaintiff was then 2½–3 feet from the primary line, and standing on the extreme east end of the transformer.

So far as evidence of his direct contact with the electricity is concerned, the proof showed that plaintiff sustained a severe second-degree burn on his right arm from about 8 inches above the elbow to about 8 inches below, and third-degree burns on the soles of both feet, indicating that the electricity entered his body on the arm near the right shoulder, and the points of exit were the soles of his feet.

Plaintiff seeks to be exculpated from the charge of contributory negligence as a matter of law on the theory, primarily, that he was an inexperienced servant. What he really means in this connection, and the extent to which his proof goes, is that he was without experience in working as an electrician in an energized substation. There is no substance in this claim. As to his qualifications and experience as an electrician, his own proof shows the following: He received a high school education and had attended William Jewell College one term. In 1943 he started working for the defendant company, where he did heavy work around electrical construction, and then was an electrician's helper for about eight months. He worked there about a year, and then went into the Navy. While in the Navy he took a four-months' course in the fundamental theory of electricity, and at another base attended classes which had to do with shipboard electrical operations. He was asked on cross-examination, "Your entire time or substantially all of your time in the Navy was devoted to studying electricity as it might be useful to you in your Navy career, was it not?" to which he replied, "That's right." He was discharged from the Navy in March, 1945, and went to work for Sheffield Steel Company, where he worked eight or nine months, and during part of that time he was an electrician's helper in a construction gang. He then worked eight or ten months for Otis Elevator Company on the construction of escalators, and then in 1947 went back to work for the defendant as an electrician, carrying a temporary permit from Local Union 124, International Brotherhood of Electrical Workers. Later on, probably in 1949, he received a permanent membership card from the Union with the classification of "Class A Inside Wireman", which was the highest card the Union issued. Plaintiff took two other courses in electricity held at the Kansas City Power & Light Company which were sponsored by the Electrical Maintenance Engineers, one prior to 1949 and the other thereafter. The classes met for an hour and a half or two hours two evenings a week for two and one-half or three months. Plaintiff testified that those courses "covered generally the electrical application that the average electrician would be coming in contact with," and that he regarded himself as being an average electrician.

Plaintiff had been employed by defendant as an electrician for five years prior to the accident, which occurred June 6, 1952, and during that entire period he had spent about one-half his time in working at the Staley mills, the other half being divided among other jobs. He had been

foreman on a number of jobs during the spring preceding the accident, and on those jobs he drew 12½ cents an hour over the Union scale, which was the rate of pay for a working foreman. At the time he was injured he was actually drawing a working foreman's pay, but he stated he did not feel he was a working foreman. Plaintiff had cleaned this very substation three or four times during the preceding five years. This involved cleaning the insulators of dust and dirt by the use of steel wool or rags and carbon tetrachloride, depending on the conditions. However, on all of these occasions the substation was "killed," that is, the electricity shut off in the course of the cleaning operation.

Thomas C. Cales, chairman of the apprentice training program of Local Union 124, was called on behalf of plaintiff. He testified he gave plaintiff a written examination touching his qualifications as an electrician at the time plaintiff received his Union card in 1949. That examination did not deal specifically with substations, but the same electrical principles and principles of safety would apply either in or out of a substation. The National Contractors Association (of which defendant is a member) and the Local Union follow the National Electrical Code. That code prescribes 3' 6" as the minimum horizontal clearance or working space adjacent to current-carrying parts of 11,000 voltage, and 3' 9" in the case of 22,000 volts. Cales testified that if the electrical work is within the minimum distance provided by the code, then protective equipment is needed, or the electricity must be shut off; but if the work is not within that space, then protective equipment is not needed, nor need the electricity be shut off. He was asked this question on cross-examination: "Now, based on your twenty-three years of experience, Mr. Cales, and assuming that by standing up on a disconnected transformer your body would be within 2½ to 3 feet of a 13,200 volt line, and you were going to pull on a block and tackle to tighten up a delta bar, as a qualified electrician you wouldn't crawl on top of that transformer and stand up there and be that close to that hot wire while you were pulling on a block and tackle, would you?" His answer was, "Well, it's customary not to do that, I know that." He also stated that working on an installation, cold work, 7½ feet away from any hot wire, no working foreman is required.

In this connection, one of plaintiff's experts, Wells, an electrician with forty years of experience, testified on cross-examination that in all of those years he had never climbed up on a transformer, or any other object, and put himself up against or very close to 13,200 volts exposed, and that he wouldn't have done it if someone had told him to do it. Another such witness, Spencer, stated he wouldn't get up on a transformer within 2 or 3 feet of a live wire carrying 13,200 volts and get right up against it or close to it without some sort of protective equipment.

There is no merit in plaintiff's contention that he knew nothing about high voltages. The record is directly to the contrary. He admitted he knew that under proper conditions 110 volts could kill a person (volunteering the information that statistics would show more people are killed on that voltage than any other) and that higher voltages would be correspondingly more dangerous; that he would be more anxious to keep his distance with 13,200 than with 440; that no particular training in that regard is necessary, but once a wire is hot enough to kill, regardless of the number of volts, the same rule to stay away from it applies.

In the recent case of Bryan v. Sweeney, 363 Mo. 1024, 256 S.W.2d 769, it was held that plaintiff, an experienced electrician, was guilty of contributory negligence as a matter of law (under Illinois law) when for the third time he mounted a ladder which was visibly wet (and hence

a conductor of electricity) and received an electrical shock when working about 18 feet above the ground on 220 volt wires, and, as a result, fell off the ladder and was injured. It was there held that plaintiff was charged with knowledge that the ladder was wet because the law required him to take notice of such obvious conditions and dangers, and that he would not be excused by saying he did not notice it was wet. Plaintiff seeks to distinguish this case on the ground it was not a master and servant case and also upon the facts. The opinion expressly assumed that such relationship existed.

Rosser v. City of Fayette, Mo.App., 235 S.W. 153, was an action for the wrongful death of a telephone lineman. It appeared that the lineman had knowledge that an electric light wire a little above the telephone wire he was to repair, and on the same pole, was uninsulated, and that he had been instructed by his employer to request that the current be shut off if he had to work in close proximity thereto. He was held to have been guilty of contributory negligence as a matter of law in going to work on the telephone line without requesting that the electric current be cut off, and in working with one leg over a grounded telephone wire while his head was in close proximity to the electric light wire. In reaching that conclusion the Court of Appeals said, loc. cit. 155: "Rosser knew the condition of the light wires in the city of Fayette and the absence of insulation therefrom. He must also be charged with knowing the danger of putting his leg over the messenger wire with his head in immediate proximity to the high-tension electric light wire, which he knew was uninsulated, and that the messenger wire, being grounded, afforded a perfect conduit for the current to pass through his body. The testimony tends to show that he knew these things, or that they would have been apparent to him on the slightest inspection.

"We hold, therefore, that Rosser was guilty of contributory negligence as a mat-

ter of law in permitting his head unnecessarily to come in contact with the deadly light wire, without exercising the precautions that were at hand for his own safety. Geismann v. [Missouri—] Edison Electric Co., 173 Mo. 654–676, 73 S.W. 654; Blackburn v. [Southwest Missouri] Railroad [Co.], 180 Mo.App. 548, 562, 167 S.W. 457. Defendant's instruction in the nature of a demurrer should have been given."

Morris v. Kansas City Light & Power Co., 302 Mo. 475, 258 S.W. 431, is another case relied on by plaintiff. There a mere pedestrian who had knowledge that the broken end of a light wire was hanging in the branch of a tree unnecessarily approached within 2 feet thereof and was injured when the wire fell from the tree and struck him. He was held to be contributorily negligent as a matter of law the court saying in that connection, 258 S.W. loc. cit. 432–433.

"A situation, therefore, arises where, despite the negligence of appellant, respondent would not have been injured had it not been for his own negligent act in approaching too near the deadly wire with full knowledge of the lethal current of electricity it carried, as well as with full knowledge of all the surrounding conditions and circumstances. Appellant's negligence was therefore not the proximate cause of his injuries. De Moss v. [Kansas City] Railways Co., 296 Mo. 526, 246 S.W. 566. As such facts appear from respondent's own testimony, and as facts more favorable to a recovery by him do not appear in the record, we must hold that respondent was not entitled to recovery as a matter of law, and that the trial court should have so instructed the jury.

"Our reports contain many cases holding that, where one voluntarily and unnecessarily places himself in a dangerous situation, fully knowing and realizing the danger of such situation and the hazard to which he is exposing himself in such situation, and is injured thereby, he cannot recover damages for such injuries, not-

withstanding the danger which caused such injuries resulted from the negligent act of another. The rule is so well established that citation of authorities is unnecessary. The undisputed facts in this case bring respondent squarely within the application of this rule."

In Stoffel v. New York, N. H. & H. R. Co., 2 Cir., 205 F.2d 411, a judgment of $160,000 for personal injuries was reversed outright on the ground that plaintiff did not exercise care commensurate with the danger and was contributorily negligent as a matter of law. There the plaintiff and a coworker were engaged in waterproofing a crate on a loaded flat car in the yards of the defendant railroad. They were employees of an independent contractor employed by the shipper of the crate. The plaintiff climbed up on top of the crate or case of machinery for the purpose of nailing down the waterproofing paper. A high-tension wire was less than six feet from the top of the crate. The plaintiff was 6 feet 2 inches tall. A few minutes after he got on top of the case he was severely injured by coming in contact with the wire which carried a current of 11,000 volts. The plaintiff admitted he had seen the wire and knew it would be dangerous if it was alive. He did not inquire whether it had been de-energized because he assumed his employer would not send him into a place where he might be hurt. The court held this was not a reasonable assumption, in view of the grave danger that existed if it were erroneous, and that the failure of plaintiff to take an elementary precaution for his own safety by inquiring whether the wire had been de-energized before starting to work constituted contributory negligence as a matter of law. For similar holdings in analogous circumstances, see State, for Use of Bahner v. Consolidated Gas, etc., 159 Md. 138, 150 A. 452; Milne v. Providence Tel. Co., 29 R.I. 504, 72 A. 716; Jowett v. Pennsylvania Power Co., 383 Pa. 330, 118 A.2d 452; State, for Use of Bell v. Eastern Shore Gas & Electric Co., 155 Md. 660, 142 A 503.

The very recent case of Hamilton v. Laclede Electric Cooperative, Mo., 294 S. W.2d 11, was an action for damages for personal injuries sustained while plaintiff was assisting her husband in removing a pump and the pipe attached thereto from a well in a well house on their premises when the pump came in contact with one of defendant's overhead high-tension wires. There was an aperture in the roof of the well house through which the pump and pipe were being projected upward. The husband would lift the pump and pipe about 3 feet and plaintiff would hold it while he secured another grip, and this procedure would be repeated. The high-tension wires were not directly over the well house but were some 12 feet to the south thereof. When some 25 feet of the pipe were above the hole in the roof and leaning to the south, the pump or pipe came in contact with the high-tension wire, and plaintiff was injured. She was held to have been guilty of contributory negligence as a matter of law. In that case many decisions involving injuries sustained through electrical shock or by coming in contact with electricity (including those we have referred to above) were reviewed, and, among many others, the following pronouncements were cited approvingly: "Persons of ordinary intelligence are presumed to know the dangers attending contact with wires electrically charged." 294 S.W.2d 17; 29 C.J.S., Electricity, § 66c. "When the negligent act of the plaintiff is necessary to make a dangerous situation negligently created by the defendant effective in harm, the plaintiff's negligence is always a contributory factor in producing his harm and as such prevents him from recovery against the negligent defendant." 2 Restatement, Torts, 1251, 1252, § 478.

"The law imposes upon a person, sui juris, the obligation to use ordinary care for his own protection, the degree of which is commensurate with the dangers to be avoided; and one who voluntarily and un-

necessarily assumes a position of danger, the hazards of which he understands and appreciates, cannot recover for an injury from a risk incident to the position." 38 Am.Jur., Negligence, § 182.

It abundantly appears that the work in which plaintiff and Lingo were engaged was what is known as cold work for which protective equipment was not needed, and it was not dangerous to do the same as long as the work was done properly. It was somewhat aptly described by one of the witnesses as being "cold work in a hot substation." Plaintiff was intimately familiar with the substation and readily admitted he knew the location of the lines, including the three primary leads into the old transformers, and that he knew they carried a voltage of 13,200. He knew, too, that the station was energized and the current had not been shut off, and, of course, that he should avoid coming in contact with conductors. These workmen knew that if they wanted any particular equipment they could ask for it, and, under Union rules, if they had thought the work they were doing dangerous, they could refuse to do it. Stepladders were as readily available to plaintiff and Lingo as straight ladders. The proof is equivocal as to whether one of the ladders they did obtain at the Staley shop was or was not a stepladder. There was lumber available at the same place out of which to construct a platform if that were deemed necessary. As above stated, plaintiff did not attempt to pull on the block and tackle from the ladder, which was against the east side of the transformer on which he was injured, although he knew it could have been done in that way. His excuse was that he couldn't reach the end of the rope from the ladder in that position. Nor did he give any thought to the matter of tying an extension of rope on the block and tackle. He was not acting in an emergency of any kind, nor is it contended that his attention had been momentarily diverted from the work at hand. On the contrary, he formed his own conclusion that he could work from the obviously dangerous position

atop the transformer. He took a position on the extreme east side of it and in close proximity to the high-tension wire, so that any movement on his part while on the transformer would necessarily be in the direction of and closer to the wire. In assuming this position, plaintiff knew or ought to have known it was an exceedingly hazardous thing to do, and, of course, it was an act defendant had no reason to expect of him. There is no escape from the conclusion that this constituted want of due care on his part for his own safety, which entered into, and formed the direct, producing and efficient cause of the casualty, absent which the casualty would not have happened, and hence bars recovery under the authorities above cited.

We find nothing in the cases relied on by plaintiff to require a different result. Phares v. Century Electric Co., 336 Mo. 961, 82 S.W.2d 91, involved an injury to a workman in the presence and while obeying a specific order of his foreman to put an electrode in a furnace without turning off the power in an adjacent furnace. The plaintiff in the case at bar had received no specific instructions as to how to do the work, and so, unlike the Phares case, we are not here concerned with whether a foreman gave a negligent order, and if so, was it one to do something so obviously and glaringly dangerous that a reasonably prudent person would not undertake it. The fact is that on the same afternoon on which plaintiff was injured, Flanary, the general foreman, and Lingo completed the installation of the delta bar by pulling on the block and tackle from a position on the ladder under the east insulator, and this without turning off the current. Batesel v. American Zinc, Lead & Smelting Co., 276 Mo. 210, 207 S.W. 742, and Nagy v. St. Louis Car Co., Mo., 37 S.W.2d 513, involved inexperienced workmen. Here plaintiff was aware of the location of the lines and their voltages, and, as an electrician, would be deemed cognizant of the danger involved in assuming the position he did for the purpose of pulling on the

block and tackle. Such cases as Atherton v. Kansas City Power & Light Co., 356 Mo. 505, 202 S.W.2d 59; Lebow v. Missouri Public Service Co., Mo., 270 S.W.2d 713, and similar cases relied on by plaintiff are so readily distinguishable on their facts as to require no further notice. Ernst v. Union Depot Bridge & Terminal Ry. Co., Mo., 256 S.W. 222, cited by plaintiff, is likewise distinguishable on the facts, but also it is authoritative as to nothing but the result there reached, this because one member of the seven-judge court concurred in only one paragraph of the opinion and the result, three others concurred only in result, and the other two dissented.

For the reason noted, the court should have directed a verdict for defendant. Its judgment in plaintiff's favor is therefore reversed.

All concur.