WALTER COATNEY, Administrator of Estate of Walter Buel Coatney, Plaintiff in Error, v. SOUTHWEST TENNESSEE ELECTRIC MEMBERSHIP CORPORATION, Defendant in Error.—292 S. W. (2d) 420.

Western Section. Jackson. February 22, 1956.

Rehearing denied, March 16, 1956.

Petition for Certiorari denied by Supreme Court July 20, 1956.

W. Frank Crawford, Memphis, Joe C. Davis, Lexington, for plaintiff in error.

John W. Norris, Brownsville, for defendant in error.

BEJACH, J. This cause involves an appeal by Walter Coatney, administrator of the estate of Walter Buel Coatney, from a judgment of the Circuit Court of Chester County, dismissing his suit against the Southwest Electric Membership Corporation,—the plaintiff in error in this Court having been the plaintiff in the lower court, and defendant in error, Southwest Tennessee Electric Membership Corporation, having been the defendant in the lower court. For convenience, the parties will be styled as in the lower court, plaintiff and defendant.

Plaintiff, as administrator of the estate of his son, Walter Buel Coatney, sued the defendant for $25,000, alleging the wrongful death of plaintiff's intestate by electrocution, caused, as was alleged, by negligence of the defendant.

At the conclusion of all of the evidence, both that of the plaintiff and that of the defendant, the trial judge sustained a motion by the defendant for a peremptory instruction to the jury, and dismissed the cause. A motion for new trial was seasonably filed and overruled, after which an appeal in the nature of a writ of error was perfected to this Court.

Plaintiff, as appellant in this Court, has made four assignments of error. It is unnecessary to copy these assignments of error in this opinion, and unnecessary to discuss them separately. All raise the single question of whether or not the trial judge erred in granting the defendant's motion for a directed verdict; or, stated differently, whether or not on the evidence presented, this cause should have been submitted to the jury.

There is little or no dispute in the testimony, and the question, therefore, resolves itself into one of whether reasonable minds might or should have drawn different inferences or conclusions from this testimony.

Plaintiff's intestate, Walter Buel Coatney, was engaged with his cousin and partner, Robert Neal Coatney, in the television business in Henderson, Tennessee. At the time of his death he and his said partner were removing a portable television antenna which they had previously erected on the property of Mr. James Cloud, in connection with the demonstration of a television set in the Cloud home. The Cloud residence is on the west side of Barham Street in the town of Henderson, facing east. It is supplied with electric current by the defendant, application for installation of same having been made by Mr. Cloud some time previous to the occurrence of the incident involved in this law suit. Defendant's high powered lines for distribution of electric current run along the east side of Barham Street. There is a pole on the east side of the street in front of the Cloud property, and a line has been run from it across the Cloud driveway and part of the Cloud property to a pole on the Cloud property, a distance of about 122 feet from the pole on the east side of the street. This line, as well as the line along the east side of Barham Street, carried

a current in uninsulated wires, of 6,900 to 7,200 volts. There is a transformer on the pole on the east side of Barham Street, and another transformer on the pole on the Cloud property. The transformer on the east side of Barham Street is 67 feet from the residence of Mr. Cloud, and the transformer on his property is about 50 feet from the residence. The live wire across Barham Street and part of the Cloud property carries a voltage of 6,900 to 7,200. The transformer on the Cloud property reduces this voltage to from 100 to 220 volts. The pole on the Cloud property to which the transformer is attached, is a dead end pole erected without guy wires or supports. It was originally placed leaning away from Barham Street, but at the time of the accident, it had changed position to where it was leaning toward Barham Street a foot or so, thus creating a substantial sag in the wire. The wires running into the Cloud residence from the transformer were insulated.

At the time of the accident which resulted in the death of both Walter Buel Coatney and Robert Neal Coatney, they were engaged in dismantling the portable antenna which was on a trailer about a foot and a half high. The antenna pole came in contact with the live wire of defendant at a point about three or four inches from the top end of the antenna pole, as same was then extended, and both Walter Buel Coatney and Robert Neal Coatney, were killed by the electric current which passed through their bodies. A burned place about three or four inches from the top of the antenna pole, indicated the point at which it came in contact with the live wire. There were no signs or warning of any kind indicating the existence of the live wire across the Cloud property, and Mr. Cloud testi-

fied that he did not know that there was such a live wire across his property until after the accident.

The transformer on Mr. Cloud's property was approximately 50 feet from his residence. The transformer on the pole on Barham Street was 67 feet from his residence. Defendant's witness, Ben White, testified that the transformer could properly be located a distance of from 125 to 150 feet from a residence which it serves. Testimony in the record tends to establish that there is no other construction of defendant in the town of Henderson similar to that on the Cloud property. One witness, a Mr. Blasengame, who had formerly worked as a lineman for Pickwick Electric Membership Co-op., testified that he never did construct or see constructed a naked uninsulated wire with a pole unanchored, and that dead end poles were always "guyed" which was to prevent the line from pulling it down and causing the wire to sag. Other testimony in the record shows that at the corner of Barham and Fourth Streets, the defendant is serving a duplex with the same load service required at the Cloud residence, and that this service is run from a transformer on the street, a distance of 58 feet and 6 inches. It thus appears that the defendant could properly have run the service line with insulated wire from the transformer on the far side of Barham Street to the Cloud residence, and that, therefore, the real reason for erecting the pole and transformer on the Cloud property was not the necessity for having the transformer close to the Cloud house, but rather for the convenience of the Company in preparing to serve other and future customers of the defendant in that vicinity,—preparation for which was anticipated. One of defendant's witnesses, a Mr. Cottrell, testified that the pole appeared to be located on the Cloud prop-

erty to take care of future expansion. At least, a jury could have properly so found as a fact, and could also have found as a fact that the failure of defendant to secure the dead end pole on the Cloud property was negligence which proximately caused the death of plaintiff's intestate. The record discloses that since the accident here involved, the pole on the Cloud property has been straightened and tamped, thus reducing the sag of the wires suspended from it.

■ ■ Since the sole question before this Court is whether or not the trial judge erred in directing a verdict in favor of the defendant, we must, in our examination of the record for review, adopt the view of facts disclosed by the evidence which is most favorable to the plaintiff. As was said by Felts, J. in Lackey v. Metropolitan Life Insurance Co., 30 Tenn. App. 390, at page 397, 206 S. W. (2d) 806, at page 810:

"(1) In view of much of the argument in the briefs, it seems well to recall the rule, so often stated in numerous cases, by which both trial courts and appellate courts must be governed in determining a motion for a directed verdict. That rule is based on the constitutional right of trial by jury; and it has been fashioned so as to preserve that right and at the same time to administer the common law separation of function by which the jury try the facts and the judge the law. 'There can be no constitutional exercise of the power to direct a verdict in any case in which there is a dispute as to any material evidence, or any legal doubt as to the conclusion to be drawn from the whole evidence, upon the issues to be tried.' Tyrus v. [Kansas City, Ft. S. & M.] Railroad, 114 Tenn. 579, 594, 86 S. W. 1074, 1077; Brenizer v.

Nashville, C. & St. L. Ry., 156 Tenn. 479, 3 S. W. (2d) 1053, 8 S. W. (2d) 1099; Osborn v. City of Nashville, 182 Tenn. 197, 185 S. W. (2d) 510.

"(2) As said so often, this rule requires trial judges and appellate judges, in considering a motion by defendant for a directed verdict, to look to all the evidence, to take as true the evidence for plaintiff, to discard all countervailing evidence, to take the strongest legitimate view of the evidence for the plaintiff, to allow all reasonable inferences from it in his favor; and if then there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied. Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn. 551, 556, 557, 249 S. W. 984; Walton & Co. v. Burchel, 121 Tenn. 715, 723, 121 S. W. 391, 130 Am. St. Rep. 788; Provident Life and Accident Ins. Co. v. Prieto, 169 Tenn. 124, 83 S. W. (2d) 251; Osborn v. City of Nashville, supra; Tenn. Cent. Ry. Co. v. McCowan, 28 Tenn. App. 225, 188 S. W. (2d) 931; Poole v. First Nat. Bank of Smyrna, Tenn. App., 196 S. W. (2d) 563, 567-568."

On this view of the situation, from the evidence in the record before us, we think there were at least two questions about which the minds of reasonable men might have differed in their conclusions from the evidence, and the issues of this cause should, therefore, have been submitted to the jury for determination. These qustions are as follows:

1st. Whether or not it was negligence for the defendant corporation to place an uninsulated high powered

electric line across the private property of Mr. Cloud without notice or warning to either him or the public?

2nd. Whether or not it was negligence to attach such dead end, high powered uninsulated electric line to a pole on Mr. Cloud's private property without anchoring such pole by guy wires or otherwise making it safe against the sagging of wires attached to it?

An affirmative answer to either or both of these questions would have justified the further finding that such negligence was the proximate cause of Walter Buel Coatney's death.

■ The first of these questions presents the problem of whether or not the accident and resulting death of plaintiff's intestate was a foreseeable result of the act of defendant in placing a high powered uninsulated wire across private property without notice or warning. While it may be true that the particular accident which resulted in the death involved in the instant case, may not have been foreseeable as such, we must remember that the particular harm which actually did occur, need not have been specifically foreseeable, in order to make the defendant liable. As was well said by Felts, J. in the case of Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 16, 28-29, 211 S. W. (2d) 450, 457:

"So the particular harm which actually befell Spivey need not have been foreseeable. It is enough that some such harm of a like general character was reasonably foreseeable as a likely result of defendant's failure to use due care to keep him in bed and to protect him against getting out of the window in his delirium."

■ The declaration alleges and the proof establishes that all other houses in the neighborhood were served with electricity by insulated lines run directly from transformers located outside of the properties to be served, the transformer on the Cloud property being the only one located on a pole on private property, across which private property an uninsulated high powered line was constructed. To make the matter worse, this uninsulated high powered line was run across the driveway into the Cloud property, with no warning signs erected or other notice to Mr. Cloud or the public. Certainly, at the time of construction of this line, the defendant corporation should have foreseen that some future legitimate use of the Cloud driveway might bring a user of the driveway into dangerous contact with its high powered uninsulated line. At least, we think this was a question of fact to be determined by the jury.

■ With reference to the second question, we think the undisputed evidence establishes that if the dead end post, to which was attached the transformer and the high powered uninsulated line, had been anchored by guy wires or otherwise prevented from leaning toward the street, thus preventing the wires from sagging, the fatal accident involved in this cause would not have occurred. The proof is that the metal pole on deceased's portable antenna came in contact with the live wire at a point about three or four inches from the top of the antenna pole. It thus appears that a sag in the wires at that point, of no more than five inches, caused this fatal accident. In other words, if the post had been anchored with guy wires, or otherwise prevented from leaning, so as to permit a sag in the wires, it may be fairly inferred that this fatal accident would not have occurred

at all. In our opinion, the jury and not the trial judge, should have been permitted to settle this question.

In the case of Tennessee Electric Power Co. v. Sims, 21 Tenn. App. 233, 108 S. W. (2d) 801, which case dealt with the dangerous quality of electricity, and of the duty of power companies to guard against such dangers, the Court of Appeals (Eastern Section)˙ speaking through Ailor, J., said:

> "Electricity has been described as being potentially the most dangerous of the utilities commonly used today, lurking unsuspectingly in the simple and harmless wire and giving no warning of its presence. And in the location of its wires an electric company has been held obligated to either insulate its wires or place them beyond the range of persons rightfully using highways and other public places, and to exercise the utmost care to keep them in a safe condition. Geisman v. Missouri-Edison Electric Co., 173 Mo. 654, 73 S. W. 654.

> "The substance of the rule laid down in the above case seems to be that *almost any harm from electricity which could humanly have been avoided would render the company liable in damages.*" (Emphasis ours.) Tennessee Electric Power Co. v. Sims, 21 Tenn. App. 233, 236, 108 S. W. (2d) 801, 803.

Other Tennessee cases dealing with liability of electric power companies, which we think are consistent with this opinion, are: City of Lawrenceburg v. Dyer, 11 Tenn. App. 493; International Harvester Co. v. Sartain, 32 Tenn. App. 425, 222 S. W. (2d) 854; Osborne v. Tenn. Electric Power Co., 158 Tenn. 278, 12 S. W. (2d) 947;

Rogers v. City of Chattanooga, Tenn. App. 281 S. W. (2d) 504, and Kingsport Utilities Inc. v. Lawrence Brown, decided by Tennessee Court of Appeals (Eastern Section) December 23, 1954 (not yet reported).

In the instant case, it is insisted on behalf of defendant that the undisputed evidence establishes that the construction involved, was in accordance with the National Electrical Code and the Rural Electric Authority specifications, and, therefore, that defendant could not properly be held guilty of negligence. In view of the testimony of Ben White, one of defendant's witnesses, who has been employed by the Tennessee Valley Authority since 1939, that the T. V. A. does not put high tension wires near residences, and that T. V. A. tries to keep people from putting residences along their lines, we think the issue should have been submitted to the jury. Even though it be assumed that the character of construction here involved was entirely proper for use along streets and highways, it does not necessarily follow that such character of construction was also proper for use across private property and on a line leading into a private residence. The minds of reasonable men might differ as to this, and the issues should, therefore, have been submitted to the jury.

■ Again, it is insisted on behalf of defendant, that at the time of the installation of the television set in the Cloud residence, the deceased, Walter Buel Coatney, was warned of the presence of the electric line, and that, therefore, he was guilty of such contributory negligence as would bar a recovery by his administrator. The basis for this contention appears in the testimony of Allen Kelly, a witness introduced by plaintiff. This witness testified that he had a radio and television business at

which he worked part time. He said that he was present at the Cloud residence just after the portable antenna had been placed on the Cloud property and while the Coatney boys were running a lead line from same into the Cloud residence. He said he called the attention of the Coatneys to the electric line, as that would cause interference to the set. He said, however, that he did not know that the electric line was a high tension, dangerous line. Obviously, his warning was not directed against the danger of electrocution, but was directed solely to the risk of impairing efficiency of the television set which was being installed. Under these circumstances, we cannot hold that as a matter of law, the plaintiff's intestate was guilty of such contributory negligence as would bar the right of action for his death. At most, this was a question of fact for the jury, under proper instructions from the trial judge.

The reasoning of this opinion is consistent in all respects with a former opinion of this Court in the case of Turner v. Tenn. Valley Electric Co-op., 288 S. W. (2d) 747. That opinion is, at this time, still pending before the Supreme Court on petition for writ of certiorari; and, for that reason, it is not cited as an authority in the instant case.

For the reasons stated above, we think the trial judge was in error in granting a motion for peremptory instruction in favor of the defendant, in the instant case. This cause is, accordingly, reversed and remanded for a new trial consistent with this opinion.

The costs of the appeal will be paid by the defendant and appellee, Southwest Tennessee Electric Membership

Corporation. Costs of the lower court will await the final determination of the cause.

Carney, J., concurs.

Avery, P. J., (Western Section) dissents.

Avery, P. J., (Western Section) (dissenting).

The defendant is a distributor for T V A electric current over a large area of Tennessee, which includes the town of Henderson. It owns the transmission distribution lines and in order to serve the residences of the town of Henderson it constructed a 15,000 volt powerline along Barham Street, taking the power from its lines by transformer operations to the consumers.

One James Cloud owned a lot facing Barham Street and on the west side thereof, said street running generally north and south. This was a vacant lot when the distribution system was put along the street, and about July to October, 1951, Mr. Cloud built a duplex dwelling on that lot. He requested the defendant to serve that duplex dwelling with sufficient electricity to heat it, by using electrical furnaces in each apartment, and so as to have sufficient power for two hot water heaters, two electric ranges, lighting, and operation of other electrical appliances such as radios, televisions, refrigerators, etc.

The size of this lot is not shown in the record, and in bringing in the necessary current to the building, the defendant attached two uninsulated No. 6 copper wires to and through a transformer that then stood on a power pole which the record shows was directly across Barham Street on the east side thereof, in front of the Cloud lot,— stringing these lines to a pole located somewhere in the south line of this Cloud lot and at a point selected by Mr. Cloud personally (R. 55) and apparently nearly directly

south of the dwelling. The engineering plan called for these lines running across the Cloud lot to carry 6,900 to 7,200 volts of electric current. A small transformer was attached to this pole located in the property line of the Cloud lot, by which this load would be transformed or reduced to not over 240 volts, and insulated proper size wire strung from that pole on the Cloud property line into the Cloud house. These insulated wires were three in number, or 3 phase.

The uninsulated primary wires coming from the east side of Barham Street, across said street and across a portion of the Cloud lot to the pole in his property line, passed over the entrance driveway from Barham Street on the Cloud lot, which driveway was south of the dwelling. The top wire of the primary line was referred to as the ''hot wire'' located about 3½ feet above the neutral wire. This pole in the Cloud property line was the same size pole that was used along Barham Street, was 35' long, set 6' in the ground, at a slight angle leaning away from Barham Street, so as to hold these wires sufficiently tight. This pole was not fastened by guy wires to the ground. The ground was sufficiently tamped around the base of this pole when it was placed. However, the tension of the primary line had, by the time of the accident in question, drawn this pole so that it leaned slightly toward the street. The record is perfectly clear and undisputed, by all the testimony, that this hot wire was not closer to the ground than 20' and the neutral line not closer than 18' to the ground, the witnesses merely estimating that distance. However, within a few hours and on the same day of the accident, exact measurements were made to determine the height of each of those lines from the ground. There is no dispute about these measurements

whatever. The top wire was 24' 6" above the ground, and the lower, or neutral wire, 21' 6" above the ground. Photographic Exhibit 3 to the testimony of William Kelley, introduced by plaintiff, shows a fair picture of the south end of this Cloud house, the transformer pole in the Cloud property line, and the transformer pole on the east side of Barham Street, together with the respective power lines between the poles and those going to the Cloud dwelling, approximately at the southwest corner near the eave of the house.

On the day of the accident, Walter Buel Coatney and his cousin, Robert Neal Coatney, in their effort to sell a television to Mr. Cloud, took their two-wheel rubber-tired trailer on which there was an aerial with antenna, referred to as portable aerial equipment used in the demonstration of television sets to prospective customers, to the Cloud lot, and either by hand or automobile backed that trailer up the driveway of the Cloud lot, then over to the lefthand or south side of the driveway close to the property line and proceeded to erect that aerial and antenna into the space approximately 47' high, placed a television set in the Cloud residence, brought a lead-in wire from the aerial in under these high-powered uninsulated lines and into the apartment occupied by Cloud, connecting same to the television set, and left it there for three days. No difficulty seems to have been experienced at the time this aerial was erected. One Alan Kelley, a brother-in-law and Administrator of the estate of Robert Neal Coatney, was present with the two Coatney young men at the time of the erection of this aerial and antenna, and when the connection was made to the television set. He was a witness for plaintiff and testified about his presence and what he did.

To see the whole proceeding clearly, it seems necessary to describe this trailer which carried this aerial and antenna. It had a flat platform of some type, wood or metal, affording a base for the bottom end of this aerial. The aerial was in two sections of hollow pipe, the lower section 25' in length and large enough for the upper section to be placed inside thereof, and when the bottom section had been raised, there was a crank or lever which was used to propel the upper section up from its position inside the lower section until the whole aerial protruded into the air about 47'. Guy wires were attached to the top of this aerial and came down to the platform on this trailer, so that the aerial would continue to stand when properly fastened. Just how the bottom part of this aerial was attached to this trailer platform does not appear, but witnesses refer to it as some type of hinge connection, and evidently this worked in some sort of socket, because the undisputed testimony of Kelley is that when any two of the guy wires holding it up were unfastened and turned loose, the aerial would fall in any direction. This aerial was not grounded. (R. 77).

The two Coatneys went back to remove this aerial and while no eye witnesses saw what happened, as it was brought down one end (see sketch exhibit 1 to William Kelley's testimony) of one of the antenna fingers came in contact, in some manner, with some part of these uninsulated wires and both of the Coatneys were electrocuted. Immediately, a Mrs. Hazel Melton who lived across the street and had had some radio interference, looked out her window or door and saw the Coatneys on the ground, ran out there, then called a neighbor and ran back to call a doctor. The plaintiff in this case, when Mrs. Melton first got over there, was apparently on his elbows and

knees, trying to rise. Much effort was made to give artificial respiration and revive the two young men without avail.

When witnesses arrived, this trailer was sitting where it had been at the time it was left there three days before, and this aerial was on the ground back of the trailer lying away from the street. In order to get a further picture, Mr. Cloud and other witnesses, undisputed in their testimony, state that this trailer with the aerial on it was approximately 30' south of the house. In other words, the aerial was erected 30' from the dwelling and across the driveway from it, with the two high-powered lines in between its location and the dwelling. The trailer was never driven along the driveway and under the wires which crossed the driveway further back on the lot from where the trailer was left when the aerial was erected (R. 73), although there was ample room in the backyard to have erected the aerial where it could not, either in erection or dismantling, come in contact with any electric current. Just why the aerial was erected at that point is not explained by any one nor is it understandable to this Court, for it is a matter of common knowledge that aerials to serve televisions are either located within a few inches of the outside wall of dwellings, or attached to gable ends, or upon the roof.

The yard in which this pole was placed was free of shrubs and trees of any kind and a person with normal vision could stand on the ground and easily see that these two wires were not insulated. Mr. Coatney, the Administrator, on cross examination, said:

"Q. You made the statement that this wire was not insulated. How could you know that? A. I could tell by looking at it that it wasn't."

Mr. Cloud stated that he had not noticed that these lines were uninsulated and that he was not told by the employees of the defendant who erected them that they were uninsulated. He stated however, that no public conveyances moved around in his yard. There were no signs or warning signals posted by the defendant that these power lines across the Cloud yard were uninsulated or that they carried a high voltage.

In the majority opinion, extracts from the case of Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 16, 28, 29, 211 S. W. (2d) 450, 457, are applied to the facts in the instant case. The particular quotation from the Spivey opinion is as follows:

> "So the particular harm which actually befell Spivey need not have been foreseeable. It is enough that some such harm of a like general character was reasonably forseeable as a likely result of defendant's failure to use due care to keep him in bed and to protect him against getting out of the window in his delirium."

Of course this statement is highly applicable to the facts in the Spivey case. In that case the Court was dealing with the action of a man mentally unbalanced, such condition being often referred to by laymen as that of being "out of his head", all of which was known to the attendants in the hospital who had put him in a bed within two or three feet of the window through which he fell.

In the instant case we are dealing with business men on each end of the situation who, so far as the record shows, were in immediate possession of all of their faculties, and even if the Coatneys were mentally off-balance, how could it be successfully argued that the defendant

could foresee such action, as the proof shows the plaintiff and his associate, both of whom were rational, were performing at the time of the accident.

In the Spivey case, other statements were made by the learned Judge who prepared the Opinion, showing that the hospital attendants were guilty of negligence which common experience shows might have occurred. After he quoted part of Section 435 of the Restatement of Torts, to the effect that—

" 'If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.' "

he then commented:

"So the particular harm which actually befell Spivey need not have been foreseeable. It is enough that some such harm of a *like general character was reasonably foreseeable* as a likely result of defendant's failure to use due care to keep him in bed and to protect him against getting out of the window *in his delirium.*

"But quite apart from this view of the case, we think the jury could well have found that his act was not so unusual or extraordinary as to be beyond the range of reasonable expectation; but that it was a thing which might reasonably have been expected to occur *in view of his condition.* Common experience shows that patients *in such condition often jump or fall out of upper-story windows of hospitals.* Such cases are numerous in the reported decisions." (Emphasis added.)

In the instant case, both actors—the defendant which strung the wires over the yard in accordance with the National Safety Electrical Code as to height, and the plaintiff who raised the aerial and antenna—were dealing with a substance or element which we designate "electricity"; each of them knew or should have known—and in this case each of them evidently did know—that the path of electric current is toward the earth or ground. They knew this was the law, relatively speaking, of electric current. Each of them knew that when the regular path of the current was interrupted, detoured or short-circuited toward the earth by a metallic substance in the hands of a person, that the electric current would follow that detoured path into the body and that a small voltage thereof would produce death or bodily injury.

We must remember that we are dealing not alone with every possible or probable foreseeability, but we are dealing with reasonable foreseeability, and that " 'as the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less' ", as said by Judge Felts in that same Opinion, quoting Prosser on Torts, 221-2, and gave the illustration which Prof. Prosser uses, that notwithstanding the fact that the odds were perhaps a thousand to one that when a person approaches a railroad crossing, no train would pass over the crossing and strike him, yet it did not relieve the driver of the duty to look for the train as he approached with intention to cross the track.

Judge Felts also quoted from reliable, substantial and proper authorities in the Spivey case, as follows:

" 'The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of

562

apprehension. Seavey, Negligence, Subjective or Objective, 41 H. L. Rev. 6; Boronkay v. Robinson & Carpenter, 247 N. Y. 365, 160 N. E. 400. This does not mean, of course, that one who launches a destructive force is always relieved of liability, if the force, though known to be destructive, *pursues an unexpected path.* ''It was not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye.'' Munsey v. Webb, 231 U. S. 150, 156, 34 S. Ct. 44, 45 (58 L. Ed. 162); Condran v. Park & Tilford, 213 N. Y. 341, 345, 107 N. E. 565; Robert v. U. S. [Shipping Board Emergency Fleet] Corp., 240 N. Y. 474, 477, 148 N. E. 650.' Cardozo, C. J. in Palsgraf v. Long Island R. Co., 248 N. Y. 339, 344, 162 N. E. 99, 100, 59 A. L. R., 1253.'' (Emphasis added.)

We must remember again that we are dealing with a path not erected by the defendant, but a path for this deadly current to follow made by the plaintiff over an unreasonably foreseeable position in raising an antenna 30 feet from the dwelling in which was to be placed the television receiver, and particularly since there was an abundant space at the rear of the house to have raised this antenna completely out of range of any possible injurious risk. Of course, we are dealing with a situation where the material testimony, the evidence produced verbally and circumstantially, is undisputed and uncontradicted, and we fully agree with the statement on page 1 of the majority opinion to the effect:

''There is little or no dispute in the testimony, and the question, therefore, resolves itself into one of whether reasonable minds might or should have

drawn different inferences or conclusions from this testimony.''

Two alleged negligent acts of the defendant are pointed out: (1) that of stringing uninsulated wire power lines over private property of Cloud; and (2) erection of a pole in his property with a transformer thereon through which the current on these uninsulated lines was transformed so as to continue its path with proper reduced voltage, without guying this pole to prevent it from leaning and lowering the elevation of the uninsulated power line.

As to the first act of alleged negligence, it is said that the reduction in current voltage might have been obtained with a transformer on the pole located on the east side of Barham Street. This overlooks the fact that the proof, uncontradicted by any person whatsoever, is to the effect that the transformer on that pole was ''loaded'' (R. 117). It would have been an act of negligence within itself to have overloaded that transformer, for if damages to appliances in homes had resulted from such ''overloading'', the defendant would be held liable therefor. These uninsulated wires were elevated beyond the height required by the National Electrical Code. That fact is proven by reference to the Code itself, as read into the record by a witness for defendant. Again, it is said that a factor in the negligent act was stringing these high-powered lines across the driveway in the yard of Cloud, but the majority opinion overlooks the fact that the stringing of these wires across the driveway was not what caused the death of plaintiff. The antenna was never carried under the wires at the point where they crossed the driveway before it was raised. (R. 73, 74) The antenna was placed completely to the left of the

driveway (R. 92), some distance toward the front from where the lines crossed the driveway. Even if the trailer had carried the aerial and antenna on under the wires that crossed the driveway, the proof is uncontradicted that when it was carried to the Cloud lot, it was lying flat on the platform of the trailer which was about 18″ off the ground, thus showing that it could have passed safely under the lines at the driveway. Again, while it is shown that the uninsulated lines crossed two other private lots in the Henderson area, it is not shown by any proof whatever that the erection of uninsulated lines over private property is an unusual procedure. We know as a matter of common knowledge that uninsulated lines are strung all up and down our highways and streets carrying higher voltage than the one over the Cloud property; and we know as a matter of common knowledge that these uninsulated lines form a network all over the areas served by adequate electric power. The fact is also overlooked that it is necessary to ground antennas when they are erected, and this antenna was ungrounded. (R. 77) The proof in this connection is all to the effect that if the antenna had been properly grounded, there might have been some electric shock to plaintiff but not enough to produce death. (R. 78, 98) Certainly the foreseeable obligation to properly perform their duty, rests upon those who are installing appliances in our homes operated by electric energy, as is required of a company that merely strings the lines from which the energy is taken into our homes.

As to the alleged negligence with reference to the unguyed pole on the Cloud lot, if that pole had leaned sufficiently far so that the sag in these wires would have caused a less height thereof from the ground than

was required by the National Electrical Code, perhaps there would be some reason to find possible negligence in that regard. The proof here, however, is undisputed that the hot wire was 24½ feet from the ground and the neutral wire was 21½ feet above the ground at its lowest point. The proof is that this unguyed pole had leaned a little from its original position, thus permitting some little additional sag in these lines, but the undisputed proof is that there was no excessive sag in these lines and that the sag then there was about the same as that of all other wires then along the streets. The pictured exhibits show a physical situation with respect to that sag which clearly indicates that there was no excessive sag in these lines. The undisputed proof shows that the pole was a proper distance in the ground, was properly tamped, was leaned away from the street when it was first set. Reasonable minds would foresee that the earth would give to the pull put upon that pole by these lines, and unless it could be foreseen that there would be such excessive leaning of the pole to create an excessive sag, how could such action of the company be said to reasonably foresee an injury to any person on the Cloud property? We know as a matter of common knowledge that the variance of temperatures of the elements creates both a tension and a lessening of that tension in such metal wires, but when they have stood for six months and still are higher than the height required by the National Electrical Code, can it be attributable as an act of negligence at the time the wires were erected? Admitting it is the duty of defendant to inspect the lines of its distribution system and keep them in proper repair, could it be said that they were required to determine that there was a sag in lines which were higher than the requirements of the National Electrical Code?

At this point, in the cross-examination of the witness Blassingame, who testified for the plaintiff, he was shown a book styled: "U. S. Department of Commerce, National Bureau of Standards, Safety Rules for Installation and Maintenance of Communication Lines", and was asked to look at page 44, sec. 232 of the Safety Rules for Installation and Maintenance, for public streets, and state what was shown by that Section. The witness stated that this Section showed that installations of the kind in question along public streets should be such as to have the neutral wire 18' above the ground and the carrier or hot wire 20' above the ground up to 15,000 volts, and in excess of 15,000 volts the carrier lines should be 22' above the ground. The witness then stated that there was no reason why the line crossing the yard in question should be at any greater height. The witness was also shown the "National Electrical Code, National Board of Fire Underwriters, 1951", and he was asked to read from sec. 8115, on page 321, and he then read from the paragraph headed: "Structures", as follows:

"Metal structures supporting antennas shall be permanently and effectively grounded."

Following that he was asked to read sec. 8113, which he read as follows:

"Outdoor antenna and counter-poise and lead-in conductors from an antenna to a building shall not cross over electric light or power circuits and shall be kept well away from all such circuits so as to avoid the possibility of accidental contact. Where proximity to electric light and power service conductors of less than 250 volts cannot be avoided, the installation shall be such as to provide a clearance of at

least two feet. It is recommended that antenna and counterpoise conductors be so installed as not to cross under electric light or power conductors.''

The majority opinion uses the language of Judge Ailor in the case of Tennessee Electric Power Co. v. Sims, 21 Tenn. App. 233, 236, 108 S. W. (2d) 801, 803, wherein he described electricity as being potentially the most dangerous of the utilities commonly used today, and in which he said: ''lurking unsuspectingly in the simple and harmless wire and giving no warning of its presence''. And further, ''in the location of its wires an electric company has been held obligated to either insulate its wires or place them beyond the range of persons rightfully using highways and other public places, and to exercise the utmost care to keep them in a safe condition'',—supporting that statement by reference to Geismann v. Missouri-Edison Electric Co., 173 Mo. 654, 73 S. W. 654, 659. An examination of that case, showing what Judge Burgess actually said and from which Opinion Judge Ailor seemed to draw his rule, is as follows:

''Electricity is one of the most dangerous agencies ever discovered by human science, and, owing to that fact, it was the duty of the electric light company to use every protection which was accessible to insulate its wires at all points where people have the right to go, and to use the utmost care to keep them so; and for personal injuries to a person in a place where he has a right to be, without negligence upon his part contributing directly thereto, it is liable in damages.''

In that case the Court was dealing with a wire that had been insulated and with the negligence of the company

in failing to keep up that insulation, which insulation gave off a sense of security, but in fact had deteriorated.

The Court said further:

"Plaintiff's third instruction is also said to be erroneous, in that it tells the jury that, if the wire where deceased was standing had all the appearance of being properly insulated, this was an invitation or inducement to him to risk contact with it. While this instruction simply announces an abstract proposition of law, it is in accordance with what is said arguendo." (Citing several cases.)

The day is long since gone when the general public, possessing reasonable minds, does not know that electricity is being conveyed in the wires we see all over our land, and that these wires are not now considered "simple and harmless" by the general public. But that is not the statement given emphasis by the majority opinion in that case. The emphasis given by Judge Ailor is in the statement:

"The substance of the rule laid down in the above case seems to be that almost any harm from electricity which could have humanly been avoided would render the company liable in damages."

This statement is lifted out of its context completely. It is one sentence in a paragraph. The sentence was used in connection with a paragraph relating to devices which the company should use to indicate trouble on its line, and referred to the case of Sanders v. City of Carthage, 330 Mo. 844, 51 S. W. (2d) 529. The real meaning of the statement cannot be understood except that the two following sentences be used in connection

with the above quotation. Without a break, except a period, Judge Ailor said:

"This rule seems to have followed the development of devices capable of indicating trouble on lines the instant they develop. In the case of Sanders v. City of Carthage, 330 Mo. 844, 51 S. W. (2d) 529, the court held that it was the duty of an electric company to have its switchboard equipped with a ground detector, where it appeared that a ground detector would have indicated a break in a wire, in the exercise of that high degree of care required by law."

The proof is uncontradicted that had the antenna in question in the instant case had a ground wire, at the time it came in contact with the uninsulated wire, it would have thrown the circuit breaker, or in other words, it would have "kicked out" the circuit breaker and the plaintiff would not have been injured.

In the Sims case they were dealing with the possibility of fire being started from electric current, such as sparks from contact by electric wires, etc. touching ignitable material. If we are to carry that unexplained statement into effect with respect to facts found in the instant case, we are making nothing less than insurers out of our electric service companies, for it could have been foreseeable that some persons traveling in planes that daily traverse the elements above us, might have to bail out and fall upon these uninsulated wires and be electrocuted as they were proceeding toward the earth in their safey parachutes letting them slowly down. The writer is not ready to lend himself to thinking that power companies must be insurers in order to protect the public,

particularly that part of the public which is supposed
to possess reasonable minds and act in an ordinary and
reasonable way for their own safety, and more particu-
larly, when they are in the construction of wires and
installations operated by electricity such as the plaintiff
was in the instant case.

I am of the opinion that the instant case is governed
by the approved rules laid down in Wallace v. Electric
Power Board, 1953, 36 Tenn. App. 527, 259 S. W. (2d)
558, decided by the Eastern Section of this Court, and
supported by the Opinions in the cases of: Moody v. Gulf
Refining Co., 142 Tenn. 280, 218 S. W. 817, 820, 8 A. L. R.
1243; Moyers v. Ogle, 24 Tenn. App. 682, 686, 148 S. W.
(2d) 637; Kelsey v. Rebuzzini, 87 Conn. 556, 89 A. 170,
52 L. R. A., N. S., 103; Louisville Home Telephone Co. v.
Gasper, 123 Ky. 128, 93 S. W. 1057, 9 L. R. A., N. S. 548;
65 C. J. S., Negligence, sec. 111, p. 693.

All of the above cases are cited with approval in
Wallace v. Electric Power Board, supra. Examining
these rules, therefore, it can be assumed that the defend-
ant could foresee that if and when an instrumentality
diverted the electric power being carried by those lines
through the body of an individual, he would be killed or
at least severely injured. But, at the height they were
above the ground and at the point where the plaintiff
erected the antenna, can it be said that there was fore-
seeability that the path of the current would be so
diverted. So looking at the situation from an intervening
cause, it is distinctly said in the Opinion in Wallace v.
Electric Power Board, [36 Tenn. App. 527, 259 S. W.
(2d) 560] referring to the case of Moody v. Gulf Refin-
ing Co., supra, that:

"The rule was there laid down that a defendant will be relieved of an original act of negligence provided harm would not have resulted from it except for the interposition of some new and independent cause which interrupted the natural sequence of events and caused the injury. As appears from the opinion in that case as well as from the holdings in numerous other cases which might be cited the problem, in the final analysis, is simply to determine which act was the proximate cause of the injury."

He also said, referring to the case of Moyers v. Ogle, supra:

"The general rule is * * * that if an independent negligent act sets into operation the circumstances which result in injury because of an already existing dangerous condition, such subsequent act is the proximate cause of the injury. See numerous cases cited in the opinion. However, there are exceptions to the general rule and respectable authority for holding that the negligence of the first person in fault will be regarded as the proximate cause of an injury wherever the negligent acts of the subsequent wrongdoer are such as a man of ordinary experience and sagacity, acquainted with all the circumstances, reasonably should have anticipated. Kelsey v. Rebuzzini [supra]. But where the negligence of a third person is of an unusual character and the defendant's act or omission alone would not have produced the injuries to the plaintiff, the defendant will not be liable. * * *

"Another principle applicable in such cases is that liability cannot be predicated on a prior or remote

cause which merely furnished the condition or occasion for an injury resulting from an intervening unrelated and efficient cause; but a condition from which injury might have been anticipated, under known prevailing conditions, will be the proximate cause notwithstanding subsequent acts of others. 65 C. J. S., Negligence, sec. 111, page 693.''

When we have a situation brought about by the erection of a television aerial in an unheard of relative position— 30 feet away from the house wherein it is to serve a television within the house,—by three men who are supposed to possess reasonable care for themselves and who are familiar with the fact that there must be contact with electricity to operate the television, and particularly, since one of them, Alan Kelley, as he took the lead-in wire from the antenna into the dwelling, called to the attention of the deceased that it was coming under these uninsulated wires and if it got too close to them it would cause a static in the reception, there can be no escape from the conclusion that these three reasonably sensible men observed these two uninsulated wires regardless of the fact that Alan Kelley did not call their attention to a danger of possible injury to themselves.

It seems to me very clear that the majority opinion does not properly construe the testimony of one Ben White, a witness for defendant, as his testimony related to the question asked him on cross-examination as follows:

''Q. T. V. A. doesn't put high tension wires near residences? A. No, sir, we try to keep people from putting residences along our lines.''

On re-direct examination, immediately following the above, he was asked and answered as follows:

"Q. State whether or not you are speaking about transmission or distribution lines? A. Transmission lines. It may help you to explain what a transmission line is. It brings the power to the sub-station. In this case, our station is west of town. We deliver the power to the Co-operative at one point." (R. 148)

So it is easily ascertainable that he was talking about transmission lines directly from T V A power plants to the sub-station that served the entire town of Henderson, as well as to sub-stations serving other entire areas. It is a matter of common knowledge that these transmission lines coming into these sub-stations carry exceedingly higher voltage than "distribution lines". It is another matter of common knowledge that if the transmission line is knocked out, the distribution lines are wholly ineffective and the whole area is involved or without service. He explained that the lines he was talking about were the "transmission lines" that brought the power to "our station" located "west of town"—meaning Henderson.

It is apparent to me that his statement in this regard had nothing to do with a "distribution" line running to a "transformer", which is what we are dealing with in this case. This fragment of testimony which seems to be misunderstood from statements made in the majority opinion, appears to me to carry no reasonable inference of negligence, or at least reasonable foreseeable injury to any one in the erection of an uninsulated line across private property, so long as its height from the ground complied with regulations provided by the National Electrical Code and followed by every concern distributing electricity that we know anything about.

I am also unable to concur in the opinion that the proof in this case shows any reasonable inference of negligence on the part of the defendant in dealing with the condition of the pole upon which the transformer was located in the Cloud property line, where the sag in the wire was never shown to have been as low as the minimum requirement of the National Electrical Code, nor that the location of the uninsulated distribution line across the property of Cloud constitutes any negligence whatsoever under the facts of this case.

Since beginning to prepare this dissenting opinion, I have received Advance Sheets No. 4, 285 S. W. (2d), and on page 4 of the ''Judicial Highlights'' is what appears to be the substance of an Opinion by the Supreme Court of Pennsylvania, in the case of Jowett v. Pennsylvania Power Co., 383 Pa. 330, 118 A. (2d) 452. There is no quotation from this case, but the complier makes this statement:

''The Supreme Court of Pennsylvania has freed a power company from liability in the death of one who was electrocuted when the television antenna which he was repairing came into contact with a high voltage line of the power company. It had been contended that the company had been negligent in failing to warn of the dangerous nature of the overhead wires. The Supreme Court, in an opinion by Horace Stern, Chief Justice, agreed with the lower court that the company owed no duty to give such a warning. It said that while a company may have been bound to take into consideration the possibility that the antenna might through some natural cause or agency come into contact with its wires, it was not obliged to anticipate that human intervention, aided

by the existence of a careless defective coupling in the antenna, which snapped during the repair operations, would bring about such an accident. The Court added that the actual and proximate cause of the accident was the defective coupling. Musmanno, J., dissented on the ground that the failure of the company to give notice of the danger was the actual and proximate cause of the accident."

It might also be well to refer to the case of Burnett v. Rutledge, Tex. Civ. App., 284 S. W. (2d) 944, 950, which is a Texas case wherein the jury found for the defendant. It involved the raising of a boom striking electric power lines on the property of an oil well concern and which lines actually belonged to the drilling company, but the suit was brought against the drilling company and also against the Southwestern Public Service Company which delivered the electricity to the drilling company, and in commenting upon the verdict of the jury, the Court said:

"The evidence reveals, without controversy, that the appellee, Southwestern Public Service Company, performed no act other than to deliver the electricity on the lease. The delivery of the electricity was effected by delivering the same to a take-off pole 495' from the well and the appellees, Rogers & Rutledge, built their own transmission line from this pole to the well. The evidence is likewise uncontroverted that the entire installation, both by Southwestern Public Service Company and Rogers & Rutledge, was in strict compliance with the laws of Texas and with the National Electrical Safety Code. Since the undisputed evidence reveals that the entire electrical installation met all requirements of the law and of

the Electrical Safety Code, it is difficult to perceive under the particular facts of this cause how any issue as to negligence of the appellees was made for presentation to the jury. In the absence of any negligence, appellees would be entitled to an instructed verdict and errors in submission, if any existed, would not be material. However, it is unnecessary to rule on such issue as the jury found appellees were not guilty of any negligence in the cause of action."

While the substance of the above quotation may be dictum as applied to the issues in a case wherein the jury had returned a verdict for defendant, yet it expresses a very clear thought of the Court with respect to what constitutes negligence on the part of suppliers of electric current. Also, in the case of Burnett v. Rutledge, it is said:

"In action by oil well cleaning contractor's employee against owners of oil well and public service company for injuries sustained when fellow employee raised mast of an oil well cleaning unit into electric wire owned by well owners, where entire electrical installation met all requirements of law and National Electrical Safety Code, there was no issue as to negligence of defendants for presentation to jury."

In the case of Beresford v. Pacific Gas & Electric Co., 45 Cal. (2d) 738, 290 P. (2d) 498, 499, a California case involving the question of fire damage from electric installation, where the wires ran under trees which fell, bringing the power line in contact with telephone lines, with respect to contributory negligence in construction, the Court said:

"In action against electric power supplier for fire damage sustained when tree on plaintiff's land fell across supplier's transmission line, energizing telephone wires, there was insufficient evidence to take contributory negligence issue to jury."

These references are simply made in this Dissenting Opinion in support of the statement that the foreseeability of injury to some one on the part of electric power distributors, with a network of such power lines all over our country, applied to such cases as the instant one now under consideration and giving our consent to the submission of such fact to the jury, destroys the usefulness of a Trial Judge sitting as a 13th juror, and also in his application of undisputed facts to the rule that they are such that no negligence is shown as a matter of law, will soon bring us into the position of saying that the electric distributors are insurers against injuries, regardless of the fact that the injuries occur over such distributing system built in accord with the national standard recognized by constructors of such power lines and the courts throughout our country, and therefore liable in damages for injuries received from contacts with such energizing wires, regardless of whether one has to go up or come down to make such contacts, and regardless of the distance involved in making such contacts.

It seems to me that when properly disrgarding all countervailing testimony, if indeed there be any at all, and considering all proper inferences that might be drawn from the entire evidence, and resolving them in favor of the plaintiff to the very logical limit, when the whole record is properly understood, there is but one course to follow, and that the Trial Court who saw the witnesses, heard their testimony, and who not only sits

as a Judge of the law but as a 13th juror, properly concluded that the minds of reasonable men would not differ as to the proximate cause of plaintiff's death, and that the proximate cause of his death was not any negligence of defendant, but was the negligence of plaintiff, and the Trial Court's judgment should be affirmed.

## On Petition for Rehearing.

BEJACH, J. We have read and carefully considered the lengthy petition to rehear filed in this cause. With all due respect for learned counsel of petitioner, we think there is nothing new presented in the petition to rehear. All of the matters embodied in the petition to rehear were carefully considered and disposed of by the majority opinion of this Court filed February 22, 1956. In addition, since that date, on to wit, March 9, 1956, the Supreme Court has denied certiorari in the case of Turner v. Tenn. Valley Electric Cooperative, 288 S. W. (2d) 747. This was a case in which, like the instant case, the trial judge directed a verdict in favor of the defendant, and in which case, this Court reversed the trial court, holding that the issues should have been determined by the jury. In the opinion of this Court, the facts in the Turner case were much weaker than those involved in the instant case, as regards the necessity of submitting same to a jury. If this Court was correct in reversing and remanding the Turner case, and the Supreme Court has ruled that it was, then, *a fortiori* this Court was correct in reversing and remanding the instant case.

The petition to rehear points out a few instances in which it is insisted that the majority opinion of this Court recites certain facts that were disclosed by the record which it is earnestly insisted are not so disclosed, such

as the statement that, "The record discloses that since the accident here involved, the pole on the Cloud property has been straightened and tamped, thus reducing the sag of the wires suspended from it." All of these instances are minor in character, and even if the majority opinion of this Court misinterpreted the record with reference to same, they are not sufficient to warrant a change in the conclusion reached.

The petition to rehear is denied.

Carney, J., concurs.

Avery, P. J. (Western Section), dissents.